DECISION.
{¶ 1} Defendant-appellant Anthony Walker appeals from his conviction and sentence for murder and felonious assault, following a second jury trial. He raises four assignments of error for our review. Because none of his assignments have merit, we affirm the judgment of the trial court.
 {¶ 2} On October 2, 1997, Walker was indicted on one count of murder in violation of R.C. 2903.02(A) in connection with the shooting death of James Hebert, Sr.; two counts of felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2) with respect to James Hebert, Jr.; and one count of felonious assault in violation of R.C. 2903.11(A)(2) with respect to Eric Byndon. Each of the charges carried multiple firearm specifications. Following a jury trial in 1998, Walker was convicted of murder and one count of felonious assault relating to James Hebert, Jr. The jury acquitted Walker of the remaining counts of felonious assault.
 {¶ 3} Walker appealed his convictions to this court. On appeal, Walker challenged, among other things, the state's use of a peremptory challenge to excuse an African-American juror,[1] relying upon Batson v. Kentucky.[2] We held that because Walker had set forth a prima facie case of discrimination and the state had proffered an explanation that was not a facially valid race-neutral justification for the peremptory challenge, Walker was entitled to a new trial or other proceedings consistent with our decision.[3] Walker also raised assignments of error regarding procedural misconduct and the weight and sufficiency of the evidence supporting his convictions. We overruled his challenge to sufficiency of the evidence.[4] But we concluded that his assignments of error relating to the weight of the evidence and prosecutorial misconduct were rendered moot by our reversal on his Batson
claim.[5]
 {¶ 4} Following our remand, the state filed a motion, which Walker adamantly opposed, requesting the trial court to conduct a hearing so that it could explain its challenge to the African-American juror.[6] The trial court granted the motion and conducted a second Batson hearing.[7] Walker appealed. In the second appeal, we concluded that the trial court had erred on remand by granting the state's motion for a Batson
hearing instead of holding a new trial, because we had already concluded that the state's reasons for challenging the juror were legally inadequate.[8] Consequently, we held that the only appropriate course on remand would have been to afford Walker a new trial.[9] We, therefore, reversed the trial court's judgment and remanded the case for a new trial.[10]
 {¶ 5} Walker's case was subsequently assigned to a new trial judge. In February 2003, a second jury trial commenced. Prior to trial, the parties had stipulated that Walker had been acquitted on two of the felonious-assault charges in the first trial, and that the state was only going forward on the murder charge and the remaining felonious-assault charge involving James Hebert, Jr. The parties also stipulated that the .357 revolver recovered in the case was the firearm in Walker's possession on September 15, 1997.
 {¶ 6} During the second trial, the state presented evidence that, on the evening of September 15, 1997, Walker and his cousin, James, entered Coach's Bar around 10:30 p.m. and asked to use the telephone. Walker was wearing a tee shirt with the words "Black Mafia" written on it. James wore a shirt with the words "Niggers with An Attitute" on the front. James Hebert, Jr. (hereinafter "Jimmy"), the owner of the bar, was seated at the bar that night watching football, along with his father, James Hebert, Sr., affectionately known as "Coach," and a friend, Duane Reid. Jennifer Murray was the barmaid that night. She was talking with two friends who were seated at the other end of the bar.
 {¶ 7} Murray directed James to the phone at the end of the bar. Murray asked Walker if he would like a drink. Walker replied, "I'll drink you, bitch." Murray, who was surprised by the comment, said, "Excuse me," and Walker repeated the same words. At that point, Jimmy stood up and told Walker that "[h]e couldn't put up with an attitude like that — that he needed to leave the bar." Jimmy testified that he did not use profanity or make any threats.
 {¶ 8} According to Jimmy, Walker ignored his request; but James, who had apparently finished his phone call and had overheard the exchange, told Jimmy that everything was all right. Jimmy testified that he disagreed, stating, "No, its' not okay. We can't have that here. You guys have got to go."
 {¶ 9} Jimmy testified that he then saw something out of the corner of his eye and ducked. He testified that Walker had thrown a punch at him, and that both Walker and James had then shoved him. Jimmy stated that he in turn shoved Walker and pushed both men toward the door. As he did so, he began to stumble. Jimmy then stated that, as he was getting his footing, he saw Walker pull out a gun. Jimmy testified that he ran at Walker and grabbed the hand that was holding the gun. Jimmy stated that he felt something hit his arm, followed by a sharp object hitting him on the back of his head. Jimmy testified that he "went out for a second" and fell down on his knees. As he was getting up, Jimmy testified, he heard two gun shots and felt something fly by his head. After the gunshots, he was able to stand up and push Walker and James out the door.
 {¶ 10} Jimmy testified that when he turned around, he saw his father, who had been shot in the stomach, lying on the floor. Jimmy sat down next to his father, who told him that he was dying. Jimmy stated that he then got up and went outside, where he saw Walker and James walking down the road. Both men then got into a car. The car turned off its lights, turned around, and headed in an easterly direction away from the bar. Jimmy then went back inside the bar to help his father. The police arrived shortly thereafter, and his father was transported by ambulance to the hospital. When Jimmy arrived at the hospital, he was told that his father had died. He gave the police a statement early the next morning.
 {¶ 11} Murray testified that after Jimmy had told Walker and James to leave, they started walking towards the door. She then saw Walker pull a gun from the waistband of his pants and wave it around. She testified that Jimmy then moved towards the door. Murray testified that Coach was standing in front of her when Walker first put the gun in the air, then intentionally reached down, and fired the gun. After Walker fired the gun, Coach dropped to his knees. Murray testified that she called for emergency assistance and that the police arrived minutes later. She was at the police station when she learned that Coach had died.
 {¶ 12} During cross-examination, Murray stated that Walker had pulled the gun out of his waistband before Jimmy had ever touched him. Murray testified that Walker put the gun to Jimmy's head. She stated, "[T]hat's when Jimmy took Walker's hand and threw it back." Murray admitted that she ducked behind the bar at that point, but that she was only there for thirty seconds to a minute. When she came out, Murray stated, she saw Jimmy stumble and fall to the floor. Murray did not recall seeing Walker strike Jimmy with the gun. When asked if there were any hands on Walker's arm when the gun fired, Murray stated that she recalled Jimmy trying to grab the gun, but that there were no hands on the gun when Coach was shot.
 {¶ 13} Reid testified that he also witnessed the incident between Jimmy and Walker. Reid testified that after Jimmy had told the Walkers to leave the bar, Jimmy "rushed the guys out the door." Reid testified that the Walkers had grabbed the door jamb in an effort to resist Jimmy. At that point, he "saw a gun come out," and he and Coach ran to the door. Reid then stated, "I saw a flash. That's all I really saw at that point was a flash. It was like a metal flash coming across and hit Jimmy in the head. * * * And then, from a point, it came up, and I saw that it was a gun pointed into the bar." Reid stated that Walker then fired the gun. Immediately thereafter, Jimmy closed the door to the bar. Reid testified that he then saw Coach fall forward and lie against the front wall, telling people that he had been shot.
 {¶ 14} Reid testified during cross-examination that Jimmy had stuck his hand up to try to block the blow to his head, but that he was knocked down from the impact. Reid stated that immediately thereafter he saw Walker deliberately raise the gun up and away before he shot it, so that other persons could not grab the gun.
 {¶ 15} James's mother, Brenda Stallworth, testified that she received a call from James on the evening of September 15, 1997, asking that she pick him and Walker up at Coach's Bar. James told her that their car had broken down. Stallworth testified that when she approached the bar, she saw her son and nephew waiting. As they got in the car, Walker told her that he had just shot someone in the bar. She then drove off quickly. Stallworth stated that she dropped Walker off at her home, picked up her children, and left. She testified that she did not see her nephew again until the trial.
 {¶ 16} A warrant was issued for Walker's arrest. Walker was located in February 1998 in Loudon, Tennessee. Cincinnati Police Detective Harry Frisby interviewed Walker. Walker provided Frisby and another police detective with a taped statement regarding the shooting at Coach's Bar. During the interview, Walker admitted that he had gone into Coach's Bar with his cousin, James, on the night of the murder to use the telephone. He stated that a racial comment was made to him, which initiated a fight between himself and the other men in the bar. Walker stated that he punched one man, who "went down" to the floor. Walker stated that the other bar patrons threw chairs at him and James as they tried to get out the door. He stated that he thought he saw someone at the bar hand an older man a weapon, so he reached into his waistband and pulled out a gun. Walker told police that when this happened, he was already at the door. Walker further stated that people were still coming at him and James, and that he fired one shot into the bar when the people were just about on him. Walker stated that he and James immediately left the bar and that he never knew "if anyone got hit or not."
 {¶ 17} In another taped statement, Walker told police that he had thrown the murder weapon into the Ohio River as he crossed a bridge into Kentucky. When police showed him a photograph of the gun, a .357 revolver, and indicated that they had recovered it from a residence, Walker recanted and admitted that he had put the gun in the back of a home on Kirby Street before he left town.
 {¶ 18} Police who searched the car that the Walkers had been driving on the night of the murder recovered ammunition for a .357 revolver, a fuel tank, and a .22 semi-automatic rifle. Criminalist William Schrand testified that he tested both the .357 revolver and the bullet the coroner had removed from Coach. Schrand found that the class characteristics on the spent bullet were consistent with those found on the revolver. Schrand further testified that the revolver did not have a "hair trigger" pull, so it would have taken a significant amount of pressure to fire the revolver.
 {¶ 19} Dr. Gary Utz, a forensic pathologist at the Hamilton County Coroner's Office, testified that Coach had died from a gunshot wound to his abdomen. Utz testified that Coach's gunshot wound was consistent with a person firing the gun at an elevated level.
 {¶ 20} The jury found Walker guilty of murder and felonious assault and the accompanying gun specifications. The trial court sentenced Walker to fifteen years to life for the murder, to eight years, the maximum prison term, for the felonious assault, and to three years for the gun specifications, and ordered the sentences to be served consecutively. In this appeal Walker now raises four assignments of error for our review.
 {¶ 21} In his first assignment of error, Walker argues that the trial court erred in permitting the state to introduce testimony regarding the .22 semiautomatic rifle recovered during its investigation. Walker claims that because the rifle was not connected to the murder, it should not have been seen by the jury or mentioned by the police detective who had recovered the rifle during the murder investigation. Walker contends this evidence was irrelevant and highly prejudicial.
 {¶ 22} Evid.R. 402 permits the admission of relevant evidence. Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[11] Relevant evidence is admissible, except where the probative value of the evidence is substantially outweighed by its prejudicial effect.[12] A trial court ordinarily has broad discretion in the admission or exclusion of evidence, and absent a clear abuse of discretion, a reviewing court should not disturb the trial court's decision.[13]
 {¶ 23} During the trial, Detective Hoderlein testified that, shortly after the shooting, he received information from an off-duty police officer regarding the location of potential evidence, including the location of the car in which Walker had been riding immediately prior to the murder. Hoderlein testified that he searched the car and recovered a box of ammunition for a .357 revolver, the weapon used in the murder, a .22 semiautomatic rifle, and a fuel tank.
 {¶ 24} Defense counsel objected immediately following Hoderlein's statement. The objection was based on a motion in limine that defense counsel had filed prior to trial. Defense counsel argued that the trial court should prohibit the state from mentioning anything about a prior shooting, which had involved Walker in another area of town, on the night of the murder.
 {¶ 25} The trial court agreed that the details of that shooting and specific evidence, such as the bullet holes found in the car, could not mentioned during trial. The court, however, overruled defense counsel's objection to Hoderlein's statement regarding the rifle. The court stated that it would allow Detective Hoderlein to mention any items recovered during the murder investigation, but that the inquiry could delve no further. The trial court did not allow the state to admit the rifle into evidence.
 {¶ 26} Here, the trial court did not abuse its discretion in admitting testimony regarding the rifle. The rifle was relevant as part of what the police had uncovered in their investigation, and in light of Walker's claim that the shooting was accidental. The rifle was relevant to show that Walker had knowledge and exposure to weapons and ammunition prior to the shooting. Moreover, because the trial court did not permit any other reference to the rifle outside of its recovery, we are not convinced that it was prejudicial to Walker. Consequently, we overrule Walker's first assignment of error.
 {¶ 27} In his second assignment of error, Walker contends the trial court erred in refusing to give a requested instruction on reckless homicide as a lesser-included offense of murder.
 {¶ 28} The Supreme Court of Ohio has adopted a two-part test to determine whether a jury instruction on a lesser-included offense is necessary.[14] First, the trial court must determine whether the offense on which the instruction is requested is a lesser-included offense of the crime charged.[15] Second, the trial court must determine whether the evidence adduced at trial would support an instruction on the lesser-included offense.[16] If the trial court determines that it is possible under any reasonable view of the evidence for the jury to find the defendant not guilty of the greater offense and guilty of the lesser offense, then it must instruct the jury on the lesser-included offense.[17]
 {¶ 29} In State v. McCurdy, we held that reckless homicide under R.C. 2903.041 is a lesser-included offense of murder under R.C. 2903.02,[18] because the only difference is the culpable mental state. Consequently, the first part of the test was satisfied in this case. In order to meet the second part of the test, Walker had to point to evidence adduced at trial supporting an instruction on reckless homicide.
 {¶ 30} Walker contends that he presented evidence that he had acted recklessly in shooting Coach. Walker's defense throughout the trial was that the gun had accidentally discharged during a struggle in the bar; thus, he had not purposefully intended to kill Coach. Walker contends that because there was competent evidence, not only from his statements to police, but from the state's witnesses, that there was a struggle for the gun, and that the gun had discharged during the struggle, striking Coach, he was entitled to an instruction on reckless homicide. We disagree.
 {¶ 31} Having reviewed the evidence, we cannot say the trial court erred in failing to instruct the jury on the lesser-included offense of reckless homicide. During the trial, the state presented testimony from three eyewitnesses to the murder. Although there were some inconsistencies in their testimony, each of these witnesses testified that Walker deliberately shot and killed Coach. Each witness testified that Walker had struggled with Jimmy over the gun in the doorway, but that Walker had successfully fended off Jimmy by striking him in the head with the gun. Walker then repositioned his arm in a straight, forward position and deliberately shot Coach as he approached. There was further evidence that after Walker had shot Coach he ran out of the bar, jumped into a car, and told the driver that he had just shot someone. Walker immediately changed his appearance, hid the murder weapon, and fled from the state. Given the totality of this evidence, we cannot say the jury could have reasonably acquitted Walker of the murder charge and found him guilty of the lesser-included offense of reckless homicide. Consequently, we agree with the trial court that the evidence did not warrant an instruction on reckless homicide. We, therefore, overrule Walker's second assignment of error.
 {¶ 32} In his third assignment of error, Walker argues that the evidence was insufficient as a matter of law to support his conviction and that the conviction was against the manifest weight of the evidence.
 {¶ 33} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different."[19] When a defendant challenges the sufficiency of the evidence, the relevant question is "whether after viewing the probative evidence and the inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt."[20]
 {¶ 34} When, however, a defendant challenges the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."[21]
 {¶ 35} Walker was convicted of murder and felonious assault. R.C. 2903.02(A) defines murder as "purposely caus[ing] the death of another * * *." R.C. 2903.11(A)(2) defines felonious assault as "knowingly caus[ing] or attempt[ing] to cause physical harm to another by means of a deadly weapon * * *."
 {¶ 36} In viewing the evidence in the light most favorable to the prosecution, we hold that a rational trier of fact could have concluded that the state had sufficiently proved the elements of murder and felonious assault beyond a reasonable doubt. With respect to the murder charge, the state presented testimony from three eyewitnesses. Although each of the witnesses' testimony was sometimes inconsistent regarding the shoves and blows exchanged in the time leading up to shooting, each witness testified unequivocally that Walker had deliberately pointed his gun and shot Coach as he was coming to his son's aid. Jimmy testified that he had been momentarily stunned after being struck in the head and that, before he had a chance to stand up fully, he could feel something fly by his head as he heard gunshots. Murray testified that Coach was standing in front of her when Walker put the gun in the air, then intentionally reached down, and fired the gun. When asked repeatedly during cross-examination if anyone's hand had been on the gun when it was fired, Murray replied in the negative. Likewise, Reid testified that Jimmy had struggled with Walker for the gun, but that Jimmy had been struck on the head and had fallen down from the impact. Reid stated that, immediately thereafter, he saw Walker deliberately raise the gun up and away before he shot it, so that other persons could not grab the gun. Aside from this eyewitness testimony, the state also presented evidence through Utz's testimony that Coach's gunshot wound was consistent with a person firing the gun at an elevated level. Moreover, Schrand testified that the weapon used in the murder did not have a "hair trigger" pull — that it took a significant amount of pressure to fire the gun. This evidence was sufficient to convict Walker of murder.
 {¶ 37} With respect to the felonious-assault charge, Jimmy testified that when the Walkers refused to leave, he attempted to shove them out of the bar, and that a struggle ensued between himself and Walker. Jimmy testified that Walker was holding a gun in his hand while they struggled and that as the hand came down, he felt a sharp hard object strike the back of his head. Although Murray testified that she did not see Walker strike Jimmy on the head with the gun, Reid stated that he saw a metal flash that came across and hit Jimmy in the head, and that he watched Jimmy fall and then witnessed Walker fire the gun. This evidence was sufficient to convict Walker of felonious assault.
 {¶ 38} Furthermore, we are convinced that Walker's conviction was not against the manifest weight of the evidence. Because the jury was appropriately equipped to observe the demeanor of the state's witnesses, to weigh their credibility, and to resolve any inconsistencies in their testimony, we cannot say that the jury lost its way and created a manifest miscarriage of justice. We, therefore, overrule Walker's third assignment of error.
 {¶ 39} In his fourth assignment of error, Walker contends that the trial court erred as a matter of law by sentencing him to the maximum prison term for felonious assault and by making the sentence consecutive to the murder sentence.
 {¶ 40} Having reviewed the record, we conclude that the trial court made the appropriate findings for imposing the maximum sentence for the felonious assault, and that it provided its reasons for the findings.[22] At the sentencing hearing, the trial court stated that it was imposing the maximum sentence under R.C. 2929.14(C) because Walker posed the greatest likelihood of committing future crimes. The trial court further stated that it was basing its finding on Walker's prior felony convictions, which included felonious assault, robbery, and theft. The trial court also considered that Walker had committed murder while committing the felonious assault.
 {¶ 41} With respect to the consecutive sentences, the trial court complied with R.C. 2929.14(E)(4) when it orally stated that it was imposing such sentences to protect the public and to punish Walker, and that such sentences were not disproportionate to the seriousness of Walker's conduct or to the danger he posed to the public. The trial court then discussed Walker's criminal history and the fact that he had already served a prison term for aggravated robbery. The court further complied with R.C.2929.14(E)(4)(c) when it stated that Walker's criminal record demonstrated a need to protect the public.[23]
 {¶ 42} Walker complains that it was unnecessary for the trial court to order the sentences to run consecutively because he was already going to serve a life sentence for murder. We disagree. Walker's parole eligibility will be affected by the sentence for the felonious assault.[24] Consequently, the trial court was entitled to take this factor into consideration in sentencing Walker. Because the trial court made the necessary findings to support the imposition of a maximum and consecutive sentence for the felonious assault, and because those findings are supported by the record before us, we overrule Walker's fourth assignment of error.
 {¶ 43} Having found no merit in Walker's four assignments of error, we therefore, affirm the judgment of the trial court.
Judgment affirmed.
Winkler, P.J., Gorman and Sundermann, JJ.
[1] State v. Walker (2000), 139 Ohio App.3d 52, 54,742 N.E.2d 1173.
[2] (1986), 476 U.S. 79, 106 S.Ct. 1712.
[3] Walker, supra, at 54.
[4] Id. at 57.
[5] Id. at 58.
[6] State v. Walker, 1st Dist. No. C-010400, 2002-Ohio-2149, at ¶ 3.
[7] Id. at ¶ 5.
[8] Id. at ¶¶ 8-11.
[9] Id. at ¶ 11.
[10] Id. at ¶ 15.
[11] Evid.R. 401.
[12] Evid.R. 403(A).
[13] State v. Sage (1987), 31 Ohio St.3d 173, 510 N.E.2d 343, paragraph two of the syllabus; State v. Long (1978),53 Ohio St.2d 91, 98, 372 N.E.2d 804.
[14] State v. Kidder (1987), 32 Ohio St.3d 279, 280-281,513 N.E.2d 311.
[15] Id., citing State v. Deem, 40 Ohio St.3d 205,533 N.E.2d 294, paragraph three of the syllabus.
[16] Id. at 281.
[17] State v. Davis (1983), 6 Ohio St.3d 91, 95,451 N.E.2d 772, 776.
[18] State v. McCurdy, 1st Dist. No. C-020808, 2003-Ohio-5518, at ¶ 14.
[19] State v. Thompkins (1997), 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541.
[20] State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[21] Thompkins, supra at 387.
[22] R.C. 2929.14(C) and 2929.19(B)(2); State v. Edmonson,86 Ohio St.3d 324, 328-329, 1999-Ohio-110, 715 N.E.2d 131.
[23] See State v. Comer, 99 Ohio St.3d 463, 2003-Ohio-4165,793 N.E.2d 473, at ¶ 20 (holding that a trial court must orally make its findings and state the reasons supporting its findings on the record at the sentencing hearing when imposing consecutive sentences).
[24] See R.C. 2967.13.