The STATE of Ohio, Appellee,

v.

LOWERY, Appellant.

[Cite as State v. Lowery, 160 Ohio App.3d 138, 2005-Ohio-1181.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–040157.

Decided March 18, 2005.

140

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Phillip R. Cummings, Assistant Prosecuting Attorney, for appellee.

Ryan D. Kirzner, for appellant.

GORMAN, Judge.

{¶ 1} A jury found the defendant-appellant, Jermaine Lowery, guilty of aggravated murder, in violation of R.C. 2903.01(B), and aggravated robbery, in violation of R.C. 2911.01(A). Both counts were accompanied by gun specifications. The trial court sentenced Lowery to prison for 20 years to life for the aggravated murder and ten years for the aggravated robbery, with each term to be served consecutively. Additionally, he was sentenced to a three-year term of imprisonment on each of the two gun specifications, to be served concurrently with each other but consecutively to the aggravated-murder and aggravated-robbery sentences. In total, Lowery was given life imprisonment with eligibility for parole after 33 years.

{¶ 2} Appealing his sentence and conviction, Lowery raises six assignments of error: (1) that there was insufficient evidence to support the jury's finding that he had engaged in a robbery, (2) that his convictions were contrary to the manifest weight of the evidence, (3) that the trial court erred by allowing the state to remove three prospective jurors of the same African–American race as Lowery, (4) that the trial court erred by allowing the jury to hear prohibited testimony, (5) that he was improperly sentenced based upon unsupported and constitutionally improper judicial fact-finding, and (6) that he was denied the effective assistance of counsel.

{¶ 3} For the following reasons, we affirm Lowery's convictions for aggravated murder and aggravated robbery with gun specifications. Furthermore, because the recent decision of the United States Supreme Court in *Blakely v. Washington* (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403, does not apply to indeterminate sentences, we affirm the 20–years–to–life sentence imposed by the trial court for the aggravated murder. We agree with Lowery that *Blakely* precluded the judicial fact-finding necessary under Ohio's sentencing scheme to impose the maximum sentence for the aggravated robbery because it was among the "worst forms" of the offense. See *State v. Bruce,* 159 Ohio App.3d 562, 2005-Ohio-373, 824 N.E.2d 609. But we conclude that the court's finding was harmless

error because the trial court's imposition of the maximum sentence on an alternative ground, that Lowery posed the "greatest likelihood of future crime," was expressly based on his history of prior convictions and thus did not violate *Blakely* and was supported by the record. Finally, because the case law surrounding *Blakely* does not, at least at this time, extend to the judicial findings necessary to impose consecutive sentences, and because the record supports the trial court's findings, we affirm the trial court's decision to run the sentences for the two offenses consecutively.

## FACTS

{¶ 4} At trial, Sedrick Thomas admitted that he was a street-corner drug dealer in the village of Lincoln Heights, the community where he lived and had grown up. He recalled that on July 6, 2003, he was sitting at a wall on Adams Street with a friend of his, Darnell Grey, nicknamed "Cocheise," when a white "Blazer or Explorer-type truck" pulled up to the curb. The driver, Henry Woods, and the front-seat passenger, Lowery, were familiar to him. He testified that Woods got out of the car and queried him on the price of certain drugs and eventually asked him whether he would sell him the drugs on credit. Thomas testified that he rebuked Woods, telling him that his business was on a cash-only basis.

{¶ 5} According to Thomas, Lowery had remained in the car during this discussion. He testified that Woods then returned to the SUV and that the two men drove off. Asked whether he noticed any passengers in the back seat of the vehicle, he replied that he did not notice any at that time.

{¶ 6} Thomas and his friend Grey had stayed at the wall for several minutes when another friend of his, Kevin Williams, arrived on the scene. The three men then decided to go "sit somewhere and smoke us some weed." Thomas and Grey followed Williams in Thomas's car to Williams's girlfriend's house, to drop off his car, and then all three drove in Thomas's car to their eventual destination, a local pony keg. Thomas went inside to place an order for some chicken wings, and when he came out he noticed that Woods's white SUV was now parked alongside his vehicle in the parking lot.

{¶ 7} Thomas testified that he saw Woods and Lowery in the front seat, as before. Responding to a gesture from Woods, Thomas walked over to the driver's-side window of the vehicle to speak to him. At that point, Thomas first noticed that two other acquaintances of his, Nicholas "Nick" Bolden and Randall Lowery, were sitting in the back seat.

{¶ 8} Woods continued to harangue him for drugs and money, Thomas testified. When still he refused, someone in the back seat, according to Thomas,

passed Woods a shotgun, which Woods then pointed at him, bracing it on the window. Thomas recounted how Woods then repeated over and over that he was hungry and needed drugs.

{¶ 9} Thomas testified that, as he stood there, the gun pointed directly at him, he felt frozen. He saw Lowery then step out of the front seat on the passenger's side with what he described as an assault rifle. Thomas testified that Lowery then walked with the rifle in the direction of Williams, who had gotten out of Thomas's car and was apparently attempting to make a call on his cellular telephone. As Thomas continued to talk to Woods, trying to shame him into putting down the shotgun, he heard two shots.

{¶ 10} Thomas testified that at the sound of the shots he and Woods stared at each other in surprise. Although Woods kept the shotgun aimed at him, Thomas backpedaled until he was able to see around the SUV. At that point, he testified, he saw Williams lying on the ground, curled up, and Lowery "with the assault rifle just a couple of feet away from him." Thomas recalled the distance between Lowery and Williams as "five or six feet."

{¶ 11} According to Thomas, Williams then began saying words to the effect that he was "a killer" and that he had warned people "not to mess with him." Thomas testified that Woods soon started up the SUV and that he, Thomas, took off running as soon as he could.

{¶ 12} Asked who had shot Williams, Thomas replied, "I would have to say Jermaine [Lowery] shot him. He was the only one in the area. And he got out of the car with the rifle and he was the only one back there with Kevin [Williams] and he was bragging after it was over, so, you know, to my knowledge it was Jermaine."

{¶ 13} In addition to Thomas, Gray also testified that he saw Lowery step out of Woods's SUV with an assault rifle. He testified that while Thomas was talking to Woods through the driver's-side window, he stayed in Thomas's car, listening to a CD. He corroborated Thomas's testimony that Williams had stepped out to make a cellular telephone call, and he added to Thomas's testimony by stating that he saw Lowery point the assault rifle at Williams before he heard the same two shots recalled by Thomas. Like Thomas, he ran from the pony keg's parking lot after the shots were fired.

{¶ 14} Asked by the state whether Thomas and Williams were known to have money on their persons, Gray testified that they were. Questioned about this on cross-examination, Gray explained that both men were known to "have nice cars and dress nice and smoke all day."

{¶ 15} Officers arrived at the scene shortly after the murder. Sandra Stevenson of the Lincoln Heights Police Department testified that two shell casings

were recovered from the scene. She testified that she obtained the names of all four suspects after speaking to Thomas and Gray. According to her, no other potential witnesses came forward to assist in the investigation.

{¶ 16} Williams subsequently died from his bullet wounds. Gary Utz, M.D., a forensic pathologist and Hamilton County deputy coroner, testified that the lack of soot and stippling around the wounds indicated a "close-range fire." He testified that both bullets exited from Williams's body. He further testified that the damage caused by the bullet wounds would have been extraordinary for a handgun and was consistent with a more powerful firearm.

## Weight and Sufficiency

{¶ 17} In his first assignment of error, Lowery specifically challenges the sufficiency of the evidence to support the jury's determination that he was engaged in a robbery at the time of the murder. Without quarreling with the evidence that Woods was attempting to rob Thomas with the shotgun, he argues that there was no testimony that he himself was "robbing or attempting to rob" Williams with the assault rifle. Nor, he argues, was there any evidence presented that he was acting in complicity with Woods as Woods was attempting to rob Thomas with the shotgun. For him to have been acting as an accomplice in Thomas's robbery, he points out, would have required that he had assisted, encouraged, cooperated with, advised, or incited Woods. See R.C. 2923.03(A)(2); *State v. Johnson* (2001), 93 Ohio St.3d 240, 754 N.E.2d 796, syllabus. Asserting that there was no direct evidence that he did any of these things, he points to the testimony that the shotgun brandished during the robbery was handed to Woods by the two passengers in the back seat, not by him from the front seat.

{¶ 18} The problem with Lowery's argument is, of course, that it focuses exclusively on the direct evidence, or lack of it, and ignores completely the overwhelming circumstantial evidence of his complicity. Lowery was part of a group that the jury could have reasonably inferred had followed Thomas to the pony keg. Inside the SUV was an assault rifle and shotgun. Before that, he was with Woods as Woods was attempting to get Thomas to sell him drugs on credit. As Woods was holding a shotgun aimed at Thomas through the window of the SUV in which Lowery was sitting as a passenger in the front seat, Lowery jumped out with the assault rife and within moments shot one of Thomas's friends, Williams, who was attempting to make a call on his cellular telephone. Lowery, it should be pointed out, did not testify and thus did not offer any reason for his shooting Williams unrelated to the robbery. In our view, it defies human logic to suggest that the jury could not reasonably have inferred from the circumstances that Lowery had shot Williams as part of the robbery that was taking place a few feet away.

{¶ 19} As the Ohio Supreme Court has held, "Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof. When the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus. As Justice Cook noted in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (Cook, J., concurring), "A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the state has met its burden of production at trial. On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction."

{¶ 20} We hold that the circumstantial evidence here was more than sufficient for the jury to have inferred that Lowery shot Williams as part of the robbery of Thomas.

{¶ 21} In his second assignment of error, Lowery broadens his focus, arguing that the jury lost its way and committed a manifest miscarriage of justice in concluding that he had shot and killed Williams. Again we sharply disagree.

{¶ 22} When a court reviews the record on a weight-of-the-evidence challenge, the court sits as a "thirteenth juror" and may disagree with the fact finder's resolution of disputed facts. *Thompkins,* supra, 78 Ohio St.3d at 387, 678 N.E.2d 541. If, after reviewing the record and weighing the evidence and testimony, the reviewing court determines that the jury clearly lost its way and created a manifest miscarriage of justice, then the conviction should be reversed and a new trial ordered. Id. But the power to do so is discretionary and should be exercised only " 'in the exceptional case in which the evidence weighs heavily against the conviction.' " Id., quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 23} Assailing the jury's verdict, Lowery argues that neither Thomas nor Gray testified that they actually saw him fire the assault rifle at Williams. He describes their testimony as "suspect" and "self-serving," and he further points to the fact that no gun was ever recovered and hence no "fingerprint analysis or powder residue analysis [was] presented to the judge or jury showing unbiased evidence of [his] involvement in any crime." In his view, the jury "rushed to find someone guilty without credible evidence supporting a verdict of guilty."

{¶ 24} Lowery's view of the evidence is again noteworthy for its myopia. By any measure, the testimony of Thomas and Gray constituted overwhelming circumstantial evidence that Lowery had shot and killed Williams. Both men saw

Lowery approach Williams with the assault rifle, and Gray even testified that he saw Lowery point the weapon at Williams. A moment later, two shots were fired, and Williams lay mortally wounded while Williams stood over his body, bragging, according to Thomas, that he was a killer and not to be trifled with. The fact that neither Thomas nor Gray claimed to have seen the shots actually being fired is, in this context, splitting hairs.

{¶ 25} Although Lowery characterizes the testimony of his accusers as "suspect" and "self-serving" (Gray was at one time, very early in the investigation, considered a person of interest by the police), we perceive no basis to dismiss their testimony as unreliable. We certainly cannot conclude that the jury lost its way or committed a manifest miscarriage of justice by crediting the version of events as described by these two men. The illegal nature of their drug dealing and the fact that they both were inclined to smoke marijuana and had done so on the day of the robbery and murder were factors to be considered when assessing their credibility but did not, without more, render their testimony unworthy of belief. Indeed, sitting as a "thirteenth juror," we perceive their transcribed testimony to be truthful.

{¶ 26} Finally, although Lowery decries the failure of the state to have produced the murder weapon and other physical evidence, such evidence was not necessary to convict him. See *State v. Paramore* (Sept. 19, 1997), 1st Dist. No. C–960799, 1997 WL 602913. In sum, we conclude that this is not the exceptional case where the evidence weighed heavily against conviction and that the jury's verdicts of guilty on both the charges against Lowery were not contrary to the manifest weight of the evidence.

### *Batson* Challenge

{¶ 27} In his third assignment of error, Lowery argues that the prosecution engaged in purposeful discrimination by using all three of its peremptory challenges to dismiss jurors who, like him, were African–American. The use of the state's peremptory challenges in such a manner, he argues, violated the Equal Protection Clause of the United States Constitution. See *Batson v. Kentucky* (1986), 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69.

{¶ 28} As this court has noted, "[t]he proponent of a peremptory challenge that excludes from a jury a member of a cognizable racial group assumes the burden of providing a race-neutral explanation for the challenge *only if* the challenge's opponent has established a prima facie case of purposeful racial discrimination in the exercise of the challenge." (Emphasis added.) *State v. Dockery,* 1st Dist. No. C–000316, 2002-Ohio-189, 2002 WL 63437. The procedure, referred to as a *Batson* challenge, requires the defendant to object to the state's use of its peremptory challenge to strike the juror and then to state facts or other circumstances giving rise to an inference of purposeful discrimination. Id. But if

no objection is raised to the juror's exclusion, denying the prosecution an opportunity to explain its challenge, the issue of purposeful discrimination is waived and subject only to a plain-error analysis. *State v. Ballew* (1996), 76 Ohio St.3d 244, 253, 667 N.E.2d 369, citing *State v. Lundgren* (1995), 73 Ohio St.3d 474, 485, 653 N.E.2d 304; *State v. Seiber* (1990), 56 Ohio St.3d 4, 15, 564 N.E.2d 408.

{¶ 29} Here, although the prosecution used all three of its peremptory challenges to strike African–American jurors, counsel[1] waited until the second challenge to lodge an objection based on *Batson*. In this instance, the state's peremptory challenge was to an African–American woman who was a school-teacher and whose husband worked for the Ohio Civil Rights Commission. On voir dire by the state, the woman was asked what her husband did for the commission, and although she described him as an investigator, she was unable to supply any other details of his work, claiming that she had never discussed it with him. Defense counsel objected to her exclusion on the basis of *Batson*, noting that this was the second African–American the state had singled out for exclusion. The trial court appropriately solicited from the prosecution its race-neutral explanation for the challenge. The prosecution explained that it had misgivings about whether the prospective juror was being forthright when she denied having any specific knowledge of her husband's work. The trial court concluded that the reason was race-neutral and overruled the objection.

{¶ 30} A trial court's determination that the challenge's opponent has failed to prove purposeful discrimination will not be reversed unless the determination can be said to be "clearly erroneous." *Dockery*, supra, 2002-Ohio-189, 2002 WL 63437, ¶ 3, citing *State v. Hernandez* (1992), 63 Ohio St.3d 577, 581–582, 589 N.E.2d 1310. Here, we cannot say that the trial court's determination on the *Batson* challenge was clearly erroneous given the prospective juror's inability to provide any information at all about her husband's work duties, an inability that could have legitimately piqued the suspicion of the prosecution. The fact that one spouse does not know what the other does at work is arguably implausible, or at least sufficient to trigger skepticism.

{¶ 31} The African–American juror was thus excluded and replaced by another African–American juror, the third to appear in the venire. The state later used its third and final peremptory challenge to strike this juror. Counsel

---

1. As a point of clarification, Lowery was tried with Nicholas Bolden as a codefendant. At voir dire, and throughout the trial, separate counsel represented Lowery and Bolden. It was actually Bolden's attorney of record who lodged the *Batson* objection. Although Lowery's attorney did not formally join in the objection, Bolden's counsel used the term "we" in voicing the objection. Perceiving no firm rule that would require a separate objection by Lowery's counsel, we consider this an objection raised on behalf of both defendants and therefore consider the *Batson* issue raised by Lowery below, but only with respect to the second prospective juror.

did not lodge an objection to this juror's removal, and thus the *Batson* issue was waived. See *Ballew,* supra. This prospective juror, however, repeatedly stated her reluctance to judge people, thus giving the state a more than ample race-neutral reason to use its final peremptory challenge on her, and thus perhaps explaining counsel's failure to object.

{¶ 32} Lowery's third assignment of error is overruled.

## Inadmissible Evidence

{¶ 33} In his fourth assignment of error, Lowery asserts that he was prejudiced when a police officer testified to statements made by Lowery while Lowery was being transferred back to Hamilton County. According to the officer, Lowery conveyed to him his desire to shoot him in the head with an SKS rifle.

{¶ 34} Significantly, the officer's testimony as to Lowery's statements themselves drew no objection. Counsel objected only after the prosecution had asked the officer why he thought Lowery would make such statements. This objection was overruled, but after the officer answered that he felt the statements were merely an attempt to "get my goat," a second objection was sustained. Although counsel did not ask that the jury be instructed to ignore the officer's testimony on this subject, Lowery contends that the trial court should have sua sponte given such an instruction.

{¶ 35} As for the precise testimony that was the subject of objection, the officer's opinion that Lowery's statements were made only for effect, we perceive no prejudice to Lowery. Indeed, given the testimony concerning Lowery's statements, which drew no objection, the officer's opinion might have even been helpful to the defense. There was obviously more potential for prejudice in the testimony concerning the statements themselves, but the failure of counsel to interpose a timely objection to the state's questioning on this subject constituted a waiver of the issue for appeal. And even if we were to give counsel the benefit of the doubt and assume that the two general objections finally made were belatedly in response to the entire line of questioning, we would still find the possibility of prejudice too remote to warrant reversal. As Lowery concedes in his brief, there is no way to know what effect this testimony had on the jury. Given the overwhelming circumstantial evidence of his guilt, we perceive no basis to conclude that the jury was particularly influenced by testimony as to what Lowery supposedly said on matters unrelated to the evening of Williams's murder.

## Sentencing Issues

{¶ 36} In his fifth assignment of error, Lowery challenges the trial court's decision to impose a maximum ten-year sentence for aggravated robbery and to

run the sentence consecutively to the 20–years–to–life sentence for aggravated murder.

{¶ 37} Lowery's challenge to the maximum sentence imposed for the aggravated robbery relies on a series of recent cases decided by the United States Supreme Court. In *Apprendi v. New Jersey* (2000), 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435, the court determined that any fact-finding necessary to impose a greater sentence than the "prescribed statutory maximum" has to be submitted to the jury and proved beyond a reasonable doubt. Subsequently, in *Blakely,* supra, the court made clear that the "prescribed statutory maximum" is the maximum sentence that can be imposed based solely upon the facts either found at trial ("reflected in the jury verdict") or otherwise conceded by the defendant as a result of plea or stipulation. *Blakely,* supra, 542 U.S. at ——, 124 S.Ct. at 2537, 159 L.Ed.2d 403. In other words, the Sixth Amendment guarantee of trial by jury and proof beyond a reasonable doubt prohibits determinate sentencing schemes that require judicial fact-finding for the purpose of increasing the defendant's sentence beyond that authorized without the additional facts.

{¶ 38} In *State v. Bruce,* 159 Ohio App.3d 562, 2005-Ohio-373, 824 N.E.2d 609, this court recently applied *Apprendi, Blakely,* and *United States v. Booker* (2005), —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621,[2] to the Ohio sentencing scheme. In light of the clarification afforded by *Blakely* and *Booker,* and contrary to some of our earlier decisions, see, e.g., *State v. Bell,* 1st Dist. No. C–030726, 2004-Ohio-3621, 2004 WL 1531904, we concluded that one of the alternative statutory findings necessary for the trial court to impose the maximum sentence for offenses covered by 1995 Am.Sub.S.B. No. 2—that the defendant committed one of the "the worst forms of the offense," see R.C. 2929.14(C)—fell into the category of judicial fact-finding precluded by *Apprendi* and its progeny. Although it is arguably more a matter of judicial opinion than fact-finding, we nonetheless concluded that the Supreme Court's holdings in *Apprendi* and *Blakely* applied to the "worst forms" determination. Consequently, we held that R.C. 2929.14(A)(1) and 2929.14(C) are "unconstitutional to the extent that they permit a sentencing court to impose a sentence exceeding the maximum term authorized by the facts admitted by the defendant or proved to a jury beyond a reasonable doubt." *Bruce* at ¶ 9.

{¶ 39} Following the admonition of the Ohio Supreme Court in *State ex rel. Mason v. Griffin,* 104 Ohio St.3d 279, 2004-Ohio-6384, 819 N.E.2d 644, at ¶ 17,

---

**2.** The court in *Booker* reaffirmed its holding in *Blakely* that the prescribed statutory maximum is the maximum sentence allowed by statute without any additional findings.

that the proper course for sentencing schemes affected by *Blakely* is to "apply the pertinent sentencing statutes without any enhancement provisions found to be unconstitutional," we modified the defendant's sentence in *Bruce* to the "prescribed statutory maximum," meaning, again, the maximum sentence that the defendant could have received based solely on previously adjudicated or stipulated facts. For a first-degree felony (the same as the aggravated robbery here), we determined that the "prescribed statutory maximum" (i.e., the maximum sentence authorized without the "worst forms" finding) was nine years.

{¶ 40} It should be pointed out that *Blakely* and its companion cases affect only determinate, not indeterminate, sentencing schemes. The statutory offense of aggravated murder, R.C. 2903.01, even after the sentencing reforms of 1995 Am.Sub.S.B. No. 2, and when not charged as a capital offense, remains punishable by a mandatory sentence of life imprisonment with parole eligibility after 20 years. See R.C. 2929.03(A)(1). Lowery appears to concede that *Blakely* does not affect his life sentence for aggravated murder, as he does not challenge the length of that sentence under his fifth assignment of error. This court has held that R.C. 2953.08(D) precludes appellate review of a prison term imposed for aggravated murder because the penalties are mandatory. See *State v. Broe*, 1st Dist. No. C–020521, 2003-Ohio-3054, 2003 WL 21360454, citing *State v. Terrell*, 1st Dist. No. C–020194, 2003-Ohio-3044, 2003 WL 21360278.

{¶ 41} The fact that Lowery was given a life sentence for aggravated murder does not, however, eliminate the need to discuss his aggravated-robbery sentence. As Lowery and the state agree in their briefs, the length of Lowery's sentence for aggravated robbery extends his parole eligibility date. See R.C. 2967.13; *State v. Walker*, 1st Dist. No. C–030252, 2004-Ohio-4364, 2004 WL 1857125. Both agree that with his present sentence he is not eligible for parole for 33 years: 20 years for the aggravated murder, ten years for the aggravated robbery, and three years on the two concurrent gun specifications. If the ten-year consecutive sentence is reduced, therefore, he will be eligible for parole that much sooner. This being so, any error adding to the length of Lowery's sentence for the aggravated robbery cannot be deemed harmless.[3]

{¶ 42} Here, however, another consideration must be brought to bear: in imposing a maximum sentence, the trial court found on its sentencing worksheet not only that Lowery had committed one of the worst forms of aggravated robbery but that he also posed "the greatest likelihood of future crime." Under

---

**3.** As we determined in *Bruce*, the holdings of *Apprendi*, *Blakely*, and *Booker* apply to "all cases on direct review or not yet final." *Bruce*, 159 Ohio App.3d 562, 2005-Ohio-373, 824 N.E.2d 609, at ¶ 9, citing *Booker*, supra, —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621. The failure of Lowery's counsel to raise these issues before the trial court does not constitute a waiver.

R.C. 2929.14(C), the latter finding constitutes a separate, independent ground for imposing the maximum sentence, regardless of whether the crime was deemed among the worst forms. Asked on the worksheet to state reasons for its findings, the court first articulated its view that the robbery was among the worst forms because it had been accompanied by a "senseless murder" (a finding with which we in no way disagree). The court then gave its reason for determining that Lowery posed the greatest likelihood of future crime: that he had a "long history of criminal convictions." Significant also is the fact that, on a separate portion of the sentencing worksheet, the court checked off four of five factors indicating a likelihood of recidivism, including two that focused on his prior convictions and "unsuccessful rehabilitation after delinquency or unsuccessful probation or parole."

{¶ 43} The court's finding of a high risk of recidivism, given what it described as Lowery's "long history of criminal convictions," is significant because both *Apprendi* and *Blakely* specifically allow a sentencing court to consider a defendant's prior convictions without resubmitting the fact of those convictions to the jury. *Blakely*, supra, 542 U.S. at ──, 124 S.Ct. at 2537, 159 L.Ed.2d 403; *Apprendi*, supra, 530 U.S. at 490, 120 S.Ct. 2348, 147 L.Ed.2d 435. The justification for this exception appears to be twofold: (1) that the safeguards of trial by jury and proof beyond a reasonable doubt have already attended the earlier convictions, thus eliminating the need to resubmit the matter to the jury, which, in any case, would have no basis to deny the existence of the convictions as historical facts, and (2) that prior convictions are indicators of recidivism, a sentencing area that the United States Supreme Court has observed to be the most traditional of court-determined sentencing factors and thus constitutionally distinct. See *Jones v. United States* (1999), 526 U.S. 227, 248–249, 119 S.Ct. 1215, 143 L.Ed.2d 311, cited in *Apprendi*, supra, 530 U.S. at 490, 120 S.Ct. 2348, 147 L.Ed.2d 435.

{¶ 44} As part of the post-*Blakely* jurisprudence, courts have begun to somewhat broaden the prior-conviction exception to *Blakely* by including within it sentencing factors that are concerned with the defendant's potential for recidivism based upon a prior criminal history. In *People v. Stankewitz* (2005), 126 Cal.App.4th 796, 805, 24 Cal.Rptr.3d 418, for example, the court postulated that a sentencing court may be allowed to consider a broader range of factors provided that they "presuppose one or more prior convictions," including the California factors of "prior convictions as an adult or sustained petitions in juvenile delinquency proceedings of increasing seriousness," previous service of a prison term, and performance on parole or probation. See, also, *People v. Vu* (2004), 21 Cal.Rptr.3d 844.[4]

---

4. In *Vu*, although the appeals court held that trial court, after *Blakely*, could consider the fact that the defendant had been on probation at the time of the offense, since his status arose out

{¶ 45} The *Stankewitz* court also noted that after *Blakely* had begun employing a harmless-error analysis whenever the trial court had relied on an approved sentencing factor under *Blakely,* so long as that factor alone could sustain the sentence. This theory, which strikes us as sound, is that when a court enhances a sentence on a fact properly found under *Blakely,* "the sentence is not vitiated by the court's consideration of other facts as well." *Stankewitz,* supra, 126 Cal.App.4th at 805, 24 Cal.Rptr.3d 418, "The heart of the analysis of a sentence under *Blakely* is the determination of the maximum sentence. The maximum sentence within the meaning of *Blakely* is the greatest sentence the judge can impose based on the facts reflected in the jury verdict or admitted by the defendant, plus the fact of the defendant's prior convictions, if any." Id.

{¶ 46} We find this logic persuasive here. The trial court gave alternative bases for imposing the maximum sentence, only one of which violated *Blakely.* The other alternative ground, that Lowery posed the greatest likelihood of future crime because of his prior convictions, did not. Since either finding would have supported imposition of the maximum sentence, a harmless-error analysis is appropriate. Since the error is of constitutional magnitude, the reasonable-doubt standard of *Chapman v. California* (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, applies. Applying this standard, we note that the statutory findings under R.C. 2929.14(C) are the findings necessary to justify a sentence that the court wishes to impose, and in this case we have no doubt that the trial court wished to impose upon Lowery the maximum sentence for both crimes. The court's disposition to impose the maximum sentence for the aggravated robbery is irrefutably indicated by its findings and its statements made during sentencing. Because the trial court articulated a reason that constituted a separate, legitimate ground for imposing the maximum sentence that we are convinced it was determined to impose, we deem the *Blakely* error harmless.

{¶ 47} But our analysis of the imposition of the maximum sentence for the aggravated robbery does not stop with *Blakely.* We must still determine, under a standard statutory sentencing review, whether the evidence supported the trial court's finding that Lowery posed the greatest risk of recidivism based on his "long history of criminal convictions." In his brief, Lowery quarrels with this finding, arguing that his criminal history was relatively minor, consisting of misdemeanors and delinquency adjudications.

{¶ 48} Because the trial court made all the necessary worksheet findings, we may reverse or modify the sentence only if we can clearly and convincingly say that the record does not support the findings or that the sentence is

---

of a prior conviction, the appeals court also held that the trial court could not consider whether his performance on probation had been "satisfactory," since that determination required an additional factual finding. *Vu,* 21 Cal.Rptr.3d 844.

otherwise contrary to law.   R.C. 2953.08(G)(2)(a) and (b).[5]   Reviewing Lowery's presentence-investigation report, we note that he has a very lengthy arrest history, totaling 43 offenses, some of them quite serious such as aggravated arson and aggravated armed robbery.   But he was convicted of considerably fewer of these, for such offenses as driving under suspension, possession of an open flask, criminal trespass, obstructing official business, menacing, falsification, aggravated menacing, domestic violence, and various traffic offenses.   Additionally, Lowery has a lengthy juvenile record for such offenses as assault and theft.[6]

{¶ 49}  In defense of his criminal record, Lowery argues that none of his previous convictions were for felonies;  they involved only misdemeanors and traffic offenses.   He further asserts that he has never before served any time in the penitentiary.   In this regard, he appears, incorrectly, to argue for the applicability of R.C. 2929.14(B), which requires the trial court to make certain findings for an offender who has not previously served a prison term in order to impose more than the minimum term.   But in *State v. Evans*, 102 Ohio St.3d 240, 2004-Ohio-2659, 809 N.E.2d 11, ¶ 10–15, the Ohio Supreme Court made clear, notwithstanding 1995 Am.Sub.S.B. No. 2's preference for minimum sentences for offenders with no history of imprisonment, as well as its general disapproval of maximum sentences, that when a court properly imposes a maximum sentence under R.C. 2929.14(C), there is no necessity of complying with R.C. 2929.14(B). As the court stated in *Evans*, "a maximum sentence is properly imposed if the record reveals a proper R.C. 2929.14(C) finding."   Id. at ¶ 16.

{¶ 50}  Here we conclude that the trial court made the required finding and that the record supports the reason it gave for concluding that Lowery presented

---

**5.** Citing this court's decision in *State v. Mushrush* (1999), 135 Ohio App.3d 99, 733 N.E.2d 252, Lowery phrases our standard of review as one based on whether the trial court's findings were supported by clear and convincing evidence.   The correct standard is not whether there is clear and convincing evidence to support the trial court's sentencing findings, but whether a reviewing court can state clearly and convincingly that the findings were in error.   See R.C. 2953.08(G)(2)(a) and (b).

**6.** With respect to the juvenile offenses, we note that in *State v. Montgomery*, 159 Ohio App.3d 752, 2005-Ohio-1018, 825 N.E.2d 250, discussed below in the text, a three-judge panel of this court concluded that juvenile offenses do not fall into the *Blakely* exception for prior convictions.   This conclusion is problematic, given that the rights to counsel and to proof beyond a reasonable doubt attend juvenile adjudications as they attend criminal convictions, and it would seem just as unnecessary and pointless to submit to the jury the question of whether such adjudications exist as it does to ask a jury to decide whether a person has had a prior conviction.   See *Vu*, supra, 21 Cal.Rptr.3d 844 (because state law ensures all constitutional safeguards, juvenile record can be considered under *Blakely*).   Because we believe that Lowery's record of prior convictions is sufficient to support the trial court's finding, and because the trial court did not expressly rely on Lowery's juvenile record, we do not ourselves pass on the issue whether delinquency adjudications fall within *Blakely*'s prior-convictions exception.

the greatest likelihood of committing future crimes: Lowery's lengthy history of criminal convictions. Whether or not they were only for misdemeanors, they were convictions, and they were numerous.

{¶ 51} Lowery next asks that we apply the same *Blakely* analysis to that portion of the Ohio sentencing scheme concerning the imposition of consecutive sentences, since, he argues, the statutory scheme requires the same sort of impermissible judicial fact-finding. Under R.C. 2929.14(E)(4), consecutive sentences are not authorized unless the court "finds" (1) that they are necessary to protect the public from future crime or to punish the offender, (2) that they do not result in disproportionate punishment, both with respect to the seriousness of the offender's conduct and to the danger he poses to the public, and (3) that any other enumerated factors set forth in subsections (a) through (c) apply.[7]

{¶ 52} Recently, this court decided *State v. Montgomery*, 159 Ohio App.3d 752, 2005-Ohio-1018, 825 N.E.2d 250, in which another three-judge panel addressed the identical argument concerning the application of *Apprendi* and *Blakely* to consecutive sentences. In *Montgomery*, the panel noted that the United States Supreme Court had not "to date" applied its use of the term "prescribed statutory maximum" to anything more than the sentencing range for a particular crime, as opposed to aggregate sentences for multiple crimes. Id. at ¶ 16. Viewing the application of *Apprendi* and *Blakely* to consecutive sentences as an unnecessary expansion of the Sixth Amendment jurisprudence articulated in those cases, and noting that consecutive sentences have always withstood constitutional challenge before, the panel held that *Apprendi* and *Blakely* do not apply to consecutive sentences.

{¶ 53} As the court in *Stankewitz*, supra, observed, the application of *Blakely* to consecutive sentences is "another of the most frequently litigated post-*Blakely* issues." 126 Cal.App.4th at 807, 24 Cal.Rptr.3d 418. The California Supreme Court is scheduled to address the issue in *People v. Black*, review granted July 28, 2004, No. S126182. Unfortunately, because of the many variations between the differing state, as well as federal, sentencing schemes, the decisions of other courts will not necessarily help to decide the issue in Ohio.

{¶ 54} Some of the factors underlying a court's determination to impose consecutive sentences, i.e., the need to protect the public from future crime by the defendant and to make the sentence proportionate to the danger he poses to the public, are recidivism factors. As such, if related to a defendant's history of

---

**7.** Although this court in *Terrell* and *Broe* determined that there is no appeal of a mandatory life sentence for aggravated murder, we also determined in *Broe* that R.C. 2953.08(D) does not preclude review of consecutive sentences when only one of the sentences has been imposed for aggravated murder.

prior convictions, they may be proper under *Blakely*. In any case, it is well settled that legislation enjoys a presumption of constitutionality, and, consistent with our holding in *Montgomery*, it would be denigrating that presumption to conclude that *Blakely* applies to consecutive sentencing when frankly we cannot say how far the United States Supreme Court will extend its analysis into other areas of sentencing. The law can and ought to be predictive, but not prophetic. Lacking a crystal ball, we reaffirm our decision in *Montgomery*.

{¶ 55} We need to ask ourselves, therefore, only whether the record supports the trial court's findings with respect to consecutive sentences. Clearly it does. In addition to the statutory factors already discussed under R.C. 2929.14(E)(4), the trial court gave as its reasons for consecutive sentences the gravity of the physical harm inflicted as well as Lowery's criminal history. The trial court further stated its reasons as follows: "Defendant committed the senseless aggravated murder and aggravated robbery of Kevin Williams. Defendant has a long history of criminal convictions. Also, defendant used a firearm."

{¶ 56} Other than to misidentify the victim of the robbery as Williams rather than Thomas, we hold that these findings are all supported by the record. Accordingly, we perceive no error in the trial court's decision to impose consecutive sentences in this case.

### Ineffective Assistance of Counsel

{¶ 57} In his sixth and final assignment of error, Lowery argues that he was denied the effective assistance of counsel as guaranteed by the Sixth Amendment. Essentially, he argues that his trial attorney's failure to raise in the trial court the same issues and arguments that he now presents on appeal rendered his performance ineffective. He offers only one additional ground not addressed in the previous assignments: what he alleges was his counsel's failure to obtain a plea bargain in his favor.

{¶ 58} To demonstrate ineffective assistance of trial counsel, a defendant's burden is to show (1) that his trial counsel's representation fell below an objective standard of reasonableness and (2) that counsel's deficient performance prejudiced him. See *Strickland v. Washington* (1984), 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; see, also, *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus; *State v. Powell* (1993), 90 Ohio App.3d 260, 629 N.E.2d 13. In *Lockhart v. Fretwell* (1993), 506 U.S. 364, 369, 372, 113 S.Ct. 838, 122 L.Ed.2d 180, the United States Supreme Court held that a showing of prejudice does not depend solely on whether the outcome of the trial would have been different but for counsel's substandard performance but also depends on whether "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."

{¶ 59} Since we have found no grounds for reversal of his convictions in any of Lowery's assignments of error, we obviously do not consider his counsel ineffective in this regard. The failure of defense counsel to raise a *Batson* challenge with respect to the third African–American juror excluded was undoubtedly tactical, given the prospective juror's repeated statements of reluctance to judge others. Perhaps an objection should have been lodged immediately to the questions concerning Lowery's statements in transit, but, as we have determined, there is no indication that these statements were prejudicial or that their inclusion in the record rendered the result of the trial unreliable or fundamentally unfair. Because we have rejected Lowery's challenges to the weight and sufficiency of the evidence to convict him, we cannot possibly discern any basis to say that his trial attorney was remiss in not putting before the trial court the identical arguments he makes in his brief.

{¶ 60} As for trial counsel's alleged failure to secure a favorable plea bargain, counsel began the trial by making a statement that Lowery had "always maintained his innocence and we never discussed a plea." Counsel made clear that her decision not to discuss a plea with the prosecution was "at his [Lowery's] request." Since Lowery appears to have directed his counsel not to pursue plea negotiations, we perceive no error or omission in his counsel doing what Lowery directed. If Lowery's argument is that his trial counsel should have done more to convince him to accept a plea bargain, then his claim relies on evidence outside the record as to what discussions he had with counsel, and what plea bargain, if any, the state was willing to offer. Because of its reliance on outside evidence, such a claim would clearly be more appropriate for postconviction relief.

{¶ 61} Accordingly, all of Lowery's assignments of error are overruled, and his convictions and sentences are affirmed.

Judgment affirmed.

PAINTER and SUNDERMANN, JJ., concur.