DECISION.
{¶ 1} In the late afternoon hours of May 16, 2003, Njaga Faal was shot in the chest and robbed of at least $3000 outside of 1207 West Galbraith Road in Cincinnati. Faal saw a man with braids put a handgun in his face, and he saw four or five men rush him, but he did not know which of his assailants had shot him.
 {¶ 2} An eyewitness heard the gunshot and saw a black Honda automobile waiting to pull out of a parking lot next to the scene of the shooting. Three men were in the car, and a light-skinned black man with a goatee was entering the rear driver's side door, rushing to stuff something in the car. After this fourth man entered, the car sped away.
 {¶ 3} The eyewitness called 911 and described the car and its direction of flight to the police. The police pursued the Honda and pulled it over several miles from the scene of the shooting. Defendant-appellant Martinez Terry was sitting in the front passenger seat. Neil Wynn was driving, Sanford Roberts was behind him, and Antonio Stonestreet was in the back seat behind Terry. As the suspects were exiting from the car, money was literally falling out the doors.
 {¶ 4} Inside the Honda, the police found $340, clothing, duct tape, a purple latex glove stuffed in the pocket behind the driver's seat, and two guns. One gun, a 9-mm handgun, was found on the floorboard where Terry had been seated. The registered owner of this gun had reported it as stolen in a burglary several months prior to the shooting. The second gun, a .45 caliber, was found on the floorboard near where Roberts had been seated. The gun's magazine, containing eight cartridges, was found in the pocket behind the driver's seat with the purple glove. A ballistics examination by a firearms expert matched the .45-caliber automatic to a shell casing found at the scene of the shooting. But without a bullet, the expert could not definitely say that the recovered.45-caliber gun had been used to shoot Faal. The firearms expert also test-fired both weapons recovered from the Honda and testified that they were both operable.
 {¶ 5} After they were searched, the police found $920.01 on Roberts, $5,002.01 on Stonestreet, and $841.91 Wynn. $1,006 was found in the interview room that Terry had been placed in, money that had not been there prior to Terry's arrival. The police also found a purple latex glove in Terry's pants' pocket and a flattened roll of duct tape in Stonestreet's pocket.
 {¶ 6} As a result of the gunshot wound, Faal very nearly died. He has had several surgeries to remove his spleen and part of his intestines, and he will have to have future surgeries.
 {¶ 7} The police interviewed Faal in the hospital a few days after the shooting. Faal identified Terry out of a six-man photographic array and said that Terry was the man who had put the handgun in his face. He did not know if Terry had shot him because after he saw the gun, he was told to lie down and he struggled with the assailants, hitting one in the temple. He then heard a gunshot and noticed that he had been shot in the chest.
 {¶ 8} Faal also identified Roberts as an assailant after viewing a six-man photographic array. He was not able to positively identify Stonestreet or Wynn at that time. But at trial he positively identified Terry, Roberts, Stonestreet and Wynn as his assailants.
 {¶ 9} Roberts, Terry, Stonestreet, and Wynn were indicted by the Hamilton County Grand Jury on counts of aggravated robbery with firearm specifications, robbery, and felonious assault with firearm specifications. Roberts and Terry were also charged with having a weapon under a disability, and Terry was additionally charged with receiving stolen property. The four defendants were tried together. Wynn was acquitted, but Roberts and Terry were found guilty on all counts and firearm specifications. Stonestreet was found guilty on all counts but acquitted on the firearm specifications.
 {¶ 10} Terry was sentenced to twenty-three years' incarceration. He appeals from his conviction and sentence, raising eight assignments of error. After a thorough review of the record, we affirm.
 Sufficiency and Weight of the Evidence {¶ 11} In his first three assignments of error, Terry challenges the sufficiency and weight of the evidence to support his convictions. He also argues that the trial court erred in denying his Crim.R. 29 motion to acquit him of aggravated robbery and robbery at the close of the state's case because, aside from Faal's unbelievable testimony, there was no evidence of Faal being robbed.
 {¶ 12} To determine if a trial court erred in overruling a motion for acquittal under Crim.R. 29, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt.[1] Likewise, when reviewing the entire record for sufficiency, we make the same determination.[2]
 {¶ 13} A review of the manifest weight of the evidence puts the appellate court in the role of a "thirteenth juror."[3]
We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[4] A new trial should be granted only in exceptional cases where the evidence weighs heavily against conviction.[5]
 {¶ 14} The state proceeded against Terry as either a principal or an accomplice. As an accomplice, Terry "could be held criminally liable as if [he] was the principal offender and was criminally culpable to the same degree as the principal offender."[6] To pursue a conviction under a complicity theory of aiding and abetting, the state "must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal."[7]
 {¶ 15} Faal testified that he was accosted, shot, and robbed of money. He suffered life-threatening injuries. Several days after the shooting and again at trial, Faal positively and unequivocally identified Terry as the assailant who put a handgun in his face during the robbery. Terry was also a passenger in a Honda seen fleeing from the scene of the crimes immediately after the shooting. The police stopped the Honda several minutes later and apprehended the occupants. The police found $340 in the Honda and thousands of dollars in the pockets of Terry's co-defendants. Later, the police recovered $1006 in the interview room that Terry had been placed in, money that had not been there prior to Terry's arrival. This money sufficiently corroborated Faal's testimony that he was robbed.
 {¶ 16} The police found a stolen 9-mm handgun on the floorboard where Terry had been sitting and a .45-caliber gun on the floorboard where Roberts had been sitting. They also found the .45-caliber gun's magazine and a purple latex glove stuffed into the pocket behind the driver's seat. The state presented testimony demonstrating that the only casing found at the scene of the shooting came from the .45-caliber gun found in the back of the car. The state also presented evidence that both weapons found in the Honda were operable.
 {¶ 17} In light of this evidence, we hold that the state presented more than sufficient evidence to overcome a Crim.R. 29 motion and to convict Terry of aggravated robbery[8] with a firearm specification and robbery.[9] The evidence was also sufficient to support his convictions for felonious assault[10] and receiving stolen property.[11]
Further, Terry stipulated at trial to having a prior drug conviction. This stipulation and the evidence presented at trial sufficently supported Terry's conviction for having a weapon under a disability.[12]
 {¶ 18} Finally, after weighing the evidence and considering the credibility of the witnesses, we cannot say that the jury lost its way and created a manifest miscarriage of justice. The assignments of error are overruled.
 Motion to Suppress {¶ 19} In his fourth assignment of error, Terry states that the trial court erred by not granting his motion to suppress Faal's testimony identifying Terry as an assailant. Terry argues that the identification testimony resulted from unduly suggestive techniques by the police and was not reliable.
 {¶ 20} When a witness has been confronted with a suspect before trial, due process requires a court to suppress his identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances.[13]
 {¶ 21} In his appellate brief, Terry does not cite the part of the record containing the motion to suppress or an objection by defense counsel pertaining to the evidence identifying Terry as one of the assailants. Our own search of the record indicates that no motion to suppress was filed and no objection was raised. Under these circumstances, Terry has waived all but plain error. An alleged error does not constitute plain error unless, but for the error, the outcome of the trial clearly would have been otherwise.[14]
 {¶ 22} We cannot find any error in the use of Faal's identification evidence. Police Officer Calvin Mathis visited Faal in the hospital a few days after the shooting and showed Faal a photographic array containing photographs of six African-American males with cornrows and similar facial hair and features. Terry's photograph was included in the array. Faal immediately pointed to Terry's photograph and indicated that he was the one who had shoved the gun in his face. Terry's photograph was darker than the others, but we cannot say that this flaw rendered the lineup unduly suggestive.[15]
 {¶ 23} Likewise, even assuming the darker photograph of Terry rendered the array unduly suggestive, we cannot say that the identification was unreliable under all the circumstances.[16] While Faal did not have a long time to view Terry during the commission of the crimes, he viewed him at close range and with full attention. Faal gave the investigating officer a description matching Terry prior to having been shown the photographic array with Terry's picture. Further, Faal unequivocally identified Terry, both in the hospital and at trial, as the assailant that shoved a gun in his face. Under these circumstances, we hold that the identification was reliable.
 {¶ 24} Having found no error in the use of the identification evidence, we do not need to complete the "plain error" analysis to determine whether the jury would have acquitted Terry absent the identification testimony. According, we overrule the assignment of error.
 Batson Challenges During Jury Selection {¶ 25} In Batson v. Kentucky,[17] the Supreme Court held that purposeful discrimination in the use of peremptory challenges to exclude members of a minority group violates the Equal Protection Clause of the United States Constitution. ABatson claim for purposeful discrimination in juror selection encompasses three steps. First, a defendant must establish a prima facie case of purposeful discrimination by demonstrating that members of a cognizable racial group have been peremptorily challenged, and that the facts and any other relevant circumstances raise an inference that the prosecutor has used the challenges to exclude jurors because of their race.[18]
Once this burden is met, the state must then provide a race-neutral explanation for the striking of a particular juror.[19] If the state puts forth a race-neutral explanation, the trial court must then decide, on the basis of all the circumstances, whether the defendant has proved purposeful racial discrimination.[20] These circumstances include whether the prosecutor's proffered reason for striking a panelist of a potentially targeted racial group applies just as well to an otherwise similar panelist of a different race who is permitted to serve.[21]
 {¶ 26} The race-neutral explanation given by the prosecutor during a Batson challenge does not need to rise to the level justifying a challenge for cause.[22] We will not reverse a trial court's finding of no discriminatory intent unless the finding was clearly erroneous.[23]
 {¶ 27} In his fifth assignment of error, Terry, an African-American, argues that the trial court erred by allowing the prosecution to dismiss seven of nine African-Americans because of their race. But in his argument, Terry restates and changes the issue: he argues that the trial court erred in allowing the state to use seven of nine peremptory challenges to dismiss members of the jury pool who were African-American. We are hampered in our review of either issue because Terry does not specify, and the record does not clearly demonstrate, the race of the jurors who served and the race of those dismissed by the state.
 {¶ 28} But the record does indicate that Terry objected at trial after the state's challenge of three African-American potential jurors, Burns, Starks and Brooks. After each objection, the trial court found that Terry had established a prima facie case of purposeful discrimination and required the state to put forth a race-neutral explanation for the challenge. With respect to all three persons, the court accepted the state's race-neutral explanation for the dismissal and rejected a finding of discriminatory intent. We review these determinations for error.
 {¶ 29} Before we undertake our review, we emphasize that aBatson challenge shifts the burden to the prosecutor to produce a race-neutral basis for the dismissal. This duty belongs to the prosecutor, and if she fails, neither the trial court nor an appellate court can substitute a race-neutral reason that can withstand a Batson challenge.[24] In this case, the trial court accepted the state's explanation but also articulated its own justification. We limit our review to the state's proffered explanation.
 Potential Juror Burns {¶ 30} The state expressed two reasons for excluding Burns. First, her responses indicated that she did not feel the police would provide an adequate response to her reporting of a crime and that she had a "street justice mentality." Second, Burns stated her belief that there was different treatment under the law based upon a person's race and socioeconomic background. After allowing the defense to comment, the trial court found this explanation race-neutral and overruled the Batson challenge.
 {¶ 31} The facts of this case support the state's explanation. When asked by the prosecutor whether she believed "that all people are allowed to have equal protection of the laws?" Burns replied, "I believe it is allowed. I don't believe that it happens." She went on to say that there was different treatment under the law based upon "race and economic background." When the prosecutor tried to explore Burns's attitude toward the police after she was the victim of three burglaries, Burns said that she "dealt with [her burglaries] on [her] own" and did not report them because "it would be a waste of time." She said, "I took care of it myself. * * * I called some people that I knew and told them what was taken and I got it back."
 {¶ 32} In light of Burns's comments, we hold the trial court did not err in accepting the prosecutor's race-neutral explanation for the challenge.
 Potential Juror Starks {¶ 33} The state's proffered reason for dismissing Starks was that defense counsel for co-defendant Wynn had represented Starks's son two years earlier on a federal charge of possessing a firearm while under a disability. She further noted that Terry and his co-defendant Roberts were being prosecuted on similar state charges for possessing a firearm while under a disability. The state's explanation was supported by Starks's testimony, and after allowing the defense to comment, the court accepted it as a race-neutral basis for the challenge. We do not find error in this.
 Potential Juror Brooks {¶ 34} The state explained that it dismissed Brooks because she made "several deep breath-type things" while another potential juror was discussing police officers, and because she gave two strange responses during voir dire. The first response came after the trial court asked her why she had raised her hand: she said that she was talking to the Lord. Later, when asked by the prosecutor if she wanted to respond to any of the questioning that had already occurred, she stated that she did not feel people should be coerced into saying something that they do not want to say. The prosecutor told the court that she felt the later comment was directed at her, and that she had an overall "negative feeling" about Brooks as a juror.
 {¶ 35} After listening to comments from the defense, the court accepted the state's race-neutral explanation, and we cannot say that this finding was clearly erroneous. "An impression of the conduct and demeanor of a prospective juror during the voir dire may provide a legitimate basis for the exercise of a peremptory challenge" if it is "sufficiently specific to provide a basis upon which to evaluate [its] legitimacy."[25] The trial court stated that it had no reason not to believe the prosecutor, and we will not disturb this determination of credibility where the record supports the state's basis.[26]
 {¶ 36} Accordingly, we affirm the trial court's determination of no discriminatory intent in the state's use of peremptory challenges to dismiss potential jurors Burns, Starks, and Brooks. In doing so, we overrule the fifth assignment of error.
 Request for Readback of Trial Testimony {¶ 37} In his sixth assignment of error, Terry argues that the trial court erred by refusing the jury's request during deliberations for a reading of trial testimony. We disagree.
 {¶ 38} During jury deliberations, the court received a question from the jury asking, "What is the relationship of the black Honda's owner to the defendants?" After discussing the question with the attorneys for the defendant and the state, the court instructed the jurors to rely on their collective recollection of the testimony. The foreperson then asked the court if the jurors could have a transcript so that they could review the issue. The court denied the request, stating that it would be almost an impossibility to have a transcript from the lengthy trial prepared for deliberations.
 {¶ 39} The question of whether to reread testimony to the jury during its deliberations is left to the sound discretion of the trial court.[27] We find no abuse of discretion in the trial court's refusal to reread testimony to the jury. Accordingly, the sixth assignment of error is overruled.
 Review of Sentence {¶ 40} In his final assignments of error, Terry challenges his sentence. Terry was found guilty on one count of aggravated robbery with firearm specifications, one count of robbery, two counts of felonious assault with firearm specifications, one count of receiving stolen property, and one count of having a weapon under a disability. The trial court imposed the maximum term on all counts except for the one involving receiving stolen property, for which the court imposed a one-year term, six months less than the maximum. The court merged the firearm specifications into one three-year term to be served prior to the ten-year term imposed for aggravated robbery. Finally, the court ordered the terms imposed for aggravated robbery, receiving stolen property, having a weapon under a disability, and the first felonious assault to be served consecutively, and it ordered concurrent terms for the robbery and the second felonious assault. In total, the court imposed a twenty-three-year term of incarceration.
 {¶ 41} Terry challenges the constitutionality of Ohio's sentencing guidelines on the basis that the guidelines violate his right to a jury trial as guaranteed under the Sixth Amendment to the United States Constitution and Sections 5 and 10, Article1, of the Ohio Constitution. In support of his argument, he cites the United States Supreme Court's 2000 decision in Apprendi v.New Jersey[28] and its 2004 decision in Blakely v.Washington.[29]
 {¶ 42} The Supreme Court in Apprendi held that the right to a jury trial requires that the state submit to a jury and prove beyond a reasonable doubt any fact (other than the fact of a prior conviction) that increases the penalty for a crime beyond the "prescribed statutory maximum."[30] The Blakely court subsequently defined the "statutory maximum" for Apprendi
purposes as the maximum sentence a judge may impose solely onthe basis of the facts reflected in the jury verdict or admittedby the defendant."[31] This definition was further clarified and reiterated by the Court in State v.Booker.[32]
 {¶ 43} After the Court's decision in Booker, this court revisited earlier decisions in which we had held that Apprendi
and its progeny did not apply to Ohio's sentencing scheme.[33] As a result, in State v. Bruce,[34] we held that R.C. 2929.14(C), the statute governing the imposition of maximum sentences, was unconstitutional to the extent that it allowed a court to impose a sentence that exceeded the maximum term supported by the jury's verdict or the facts admitted by the defendant. But a defendant's jury-trial rights are not violated when the sentencing court imposes such a sentence based specifically upon the offender's history of prior convictions.[35] Further, we have held that the jury-trial right is not implicated by the imposition of consecutive terms.[36]
 {¶ 44} We have reviewed Terry's sentence in light of these holdings and find no prejudicial jury-trial-right violation. In imposing maximum terms, the court found that Terry posed the greatest likelihood of recidivism based upon his two prior felony convictions and that he had committed the worst form of the offenses. Under these facts, where the court imposed the maximum on a finding of recidivism expressly due to prior convictions, the sentence did not violate Terry's rights guaranteed under theSixth Amendment to the U.S. Constitution or Sections 5 and 10, Article 1 of the Ohio Constitution.
 {¶ 45} The court's alternative basis for imposing the maximum, that Terry had committed "the worst form of the offenses," violated Booker and its precursors, but this error was harmless in light of the court's articulation of a separate, legitimate ground to support the imposition of the maximum.[37]
 {¶ 46} The court made the relevant statutory findings on the record to support maximum terms as well as consecutive terms. The court found consecutive terms appropriate because the crimes were committed as part of a course of conduct, beginning with the theft of a firearm several months prior to the shooting, that had inflicted great physical and financial harm on Faal. Additionally, relying on Terry's prior felony convictions, the court found consecutive terms necessary to protect the public from future crime by Terry. We cannot clearly and convincingly find that the record does not support those findings or that those findings were contrary to law.
 {¶ 47} Accordingly, we overrule the seventh and eighth assignments of error.
 {¶ 48} Finding no merit to the assigned errors, we affirm the judgment of the trial court.
Judgment affirmed.
Painter, P.J., Sundermann and Hendon, JJ.
[1] See State v. Bridgeman (1978), 55 Ohio St.2d 261,381 N.E.2d 184, syllabus.
[2] See State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus.
[3] State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[4] Id., citing State v. Martin (1983), 20 Ohio App.3d 172,175, 485 N.E.2d 717.
[5] Id.
[6] State v. Terrell, 1st Dist. No. C-020194, 2003-Ohio-3044, at ¶ 10.
[7] State v. Johnson, 93 Ohio St.3d 240, 2001-Ohio-1336,754 N.E.2d 796, syllabus.
[8] R.C. 2911.01(A)(1).
[9] R.C. 2911.02(A)(2).
[10] See R.C. 2903.11(A)(1) (causing serious physical harm) and 2903.11(A)(2) (causing or attempting to cause serious physical harm to another by means of a deadly weapon).
[11] R.C. 2913.51(A).
[12] R.C. 2923.13(A)(3).
[13] State v. Waddy (1992), 63 Ohio St.3d 421, 438,588 N.E.2d 819.
[14] State v. Stojetz, 84 Ohio St.3d 452, 455, 1999-Ohio-464,705 N.E.2d 329.
[15] See State v. Green (1990), 67 Ohio App.3d 72, 79,585 N.E.2d 990.
[16] See State v. Jells (1990), 53 Ohio St.3d 22, 27,559 N.E.2d 464.
[17] (1986), 476 U.S. 79, 106 S.Ct. 1712.
[18] State v. Hill, 73 Ohio St.3d 433, 444-445,1995-Ohio-287, 653 N.E.2d 271.
[19] State v. Herring, 94 Ohio St.3d 246, 255-256,2002-Ohio-796, 762 N.E.2d 940.
[20] Id. at 256.
[21] Miller-El v. Dretke, (2005), ___ U.S. ___,125 S.Ct. 2317, 2325-2326.
[22] State v. White, 85 Ohio St.3d 433, 1999-Ohio-281,709 N.E.2d 140.
[23] Hill at 445.
[24] Miller-El, 125 S.Ct. at 2331-2332.
[25] Brown v. Kelly (C.A.2, 1992), 973 F.2d 116, 121.
[26] Herring, supra, at 247.
[27] See State v. Berry (1971), 25 Ohio St.2d 255,267 N.E.2d 775, paragraph four of the syllabus.
[28] (2000), 530 U.S. 466, 120 S.Ct. 2348.
[29] (2004), 542 U.S. 296, 124 S.Ct. 2531.
[30] Apprendi at 490.
[31] Blakely, 124 S.Ct. at 2537(emphasis in the original).
[32] (2005), ___ U.S. ___, 125 S.Ct. 738.
[33] See, e.g., State v. Eckstein, 1st Dist. No. C-030139,2004-Ohio-5059; State v. Bell, 1st Dist. No. C-030726, 2004-Ohio-3621.
[34] 159 Ohio App.3d 562, 2005-Ohio-373, 824 N.E.2d 609.
[35] State v. Lowery, 160 Ohio App.3d 138, 2005-Ohio-1181,826 N.E.2d 340, at ¶ 43.
[36] State v. Montgomery, 159 Ohio App.3d 752,2005-Ohio-1018, 825 N.E.2d 250, ¶¶ 16-17.
[37] See Lowery, supra, at ¶ 46.