DECISION.
{¶ 1} In the late afternoon hours of May 16, 2003, Njaga Faal was shot in the chest and robbed of at least $3000 outside of 1207 West Galbraith Road in Cincinnati. Faal saw a man with braids put a handgun in his face, and he saw four or five men rush him, but he did not know which of his assailants had shot him.
 {¶ 2} An eyewitness heard the gunshot and saw a black Honda automobile waiting to pull out of a parking lot next to the scene of the shooting. Three men were in the car, and a light-skinned black man with a goatee was entering the rear driver's side door, rushing to stuff something in the car. After this fourth man entered, the car sped away.
 {¶ 3} The eyewitness called 911 and described the car and its direction of flight to the police. The police pursued the Honda and pulled it over several miles from the scene of the shooting. Martinez Terry was sitting in the front passenger seat. Neil Wynn was driving, Sanford Roberts was behind him, and defendant-appellant Antonio Stonestreet was in the back seat behind Terry. As the suspects were exiting from the car, money was literally falling out the doors.
 {¶ 4} Inside the Honda, the police found $340, clothing, duct tape, a purple latex glove stuffed in the pocket behind the driver's seat, and two guns. One gun, a 9-mm handgun, was found on the floorboard where Terry had been seated. The second gun, a.45 caliber, was found on the floorboard near where Roberts had been seated. The gun's magazine, containing eight cartridges, was found with the purple glove in the pocket behind the driver's seat. A ballistics examination by a firearms expert matched the .45-caliber automatic to a shell casing found at the scene of the shooting. But without a bullet, the expert could not definitely say that the recovered .45-caliber gun had been used to shoot Faal. The firearms expert also test-fired both weapons recovered from the Honda and testified that they were both operable.
 {¶ 5} After they were searched, the police found $5,002.01 on Stonestreet, $920.01 on Roberts, and $841.91 Wynn. $1,006 was found in the interview room that Terry had been placed in, money that had not been there prior to Terry's arrival. The police also found a purple latex glove in Terry's pants' pocket and a flattened roll of duct tape in Stonestreet's pocket.
 {¶ 6} As a result of the gunshot wound, Faal very nearly died. He has had several surgeries to remove his spleen and part of his intestines, and he will have to have future surgeries.
 {¶ 7} The police interviewed Faal in the hospital a few days after the shooting. Faal identified Terry out of a six-man photographic array and said that Terry was the man who had put the handgun in his face. He did not know if Terry had shot him because after he saw the gun, he was told to lie down and he struggled with the assailants, hitting one in the temple. He then heard a gunshot and noticed that he had been shot in the chest.
 {¶ 8} Faal also identified Roberts as an assailant after viewing a six-man photographic array. He was not able to positively identify Stonestreet or Wynn at that time. But at trial he positively identified Terry, Roberts, Stonestreet and Wynn as his assailants.
 {¶ 9} Stonestreet, Roberts, Terry, and Wynn were indicted by the Hamilton County Grand Jury on counts of aggravated robbery with firearm specifications, robbery, and felonious assault with firearm specifications. Roberts and Terry were also charged with having a weapon under a disability, and Terry was additionally charged with receiving stolen property. The four defendants were tried together before a jury.
 {¶ 10} Stonestreet was found guilty on all counts but acquitted on the firearm specifications. Wynn was acquitted, but Roberts and Terry were found guilty on all counts and specifications.
 {¶ 11} Stonestreet was sentenced to seven years' incarceration. He appeals from his conviction and sentence, raising three assignments of error. After a thorough review of the record, we affirm.
 {¶ 12} In his first assignment of error, Stonestreet argues that the trial court erred in overruling a Batson challenge during voir dire. We disagree.
 {¶ 13} During voir dire, the prosecutor had already excluded four African-American jurors with peremptory challenges when she challenged a fifth African-American, juror Burns. Stonestreet, who is African-American, objected, relying on Batson v. Kentucky.[1] InBatson, the Supreme Court held that purposeful discrimination in the use of peremptory challenges to exclude members of a minority group violates the Equal Protection Clause of the United States Constitution.
 {¶ 14} The trial court held a sidebar conference and asked the state to give a race-neutral explanation for the challenge. The state expressed two reasons for excluding Burns. First, Burns's responses indicated that she did not feel the police would provide an adequate response to her reporting of a crime and that she had a "street justice mentality." Second, Burns stated her belief that there was different treatment under the law based upon a person's race and socioeconomic background. The trial court found this explanation race-neutral and overruled the Batson
challenge.
 {¶ 15} A Batson claim for purposeful discrimination in juror selection encompasses three steps. First, a defendant must establish a prima facie case of purposeful discrimination by demonstrating that members of a cognizable racial group have been peremptorily challenged, and that the facts and any other relevant circumstances raise an inference that the prosecutor has used the challenges to exclude jurors because of their race.[2] Once this burden is met, the state must then provide a race-neutral explanation for the striking of a particular juror.[3] If the state puts forth a race-neutral explanation, the trial court must then decide, on the basis of all the circumstances, whether the defendant has proved purposeful racial discrimination.[4]
 {¶ 16} Stonestreet submits that the prosecutor's explanation was not race-neutral, but a self-serving comment not supported by the questioning. He cites Burns's indication to the prosecutor that "she hoped she would be able to separate her feelings that race and socioeconomic class go into this [disparate treatment under the law]."
 {¶ 17} The race-neutral explanation given by the prosecutor during aBatson challenge does not need to rise to the level justifying a challenge for cause.[5] We will not reverse a trial court's finding of no discriminatory intent unless the finding was clearly erroneous.[6]
 {¶ 18} The facts of this case support the state's explanation. When asked by the prosecutor whether she believed "that all people are allowed to have equal protection of the laws?" Burns replied, "I believe it is allowed. I don't believe that it happens." She went on to say that there was different treatment under the law based upon "race and economic background." When the prosecutor tried to explore Burns's attitude toward the police after she was the victim of three burglaries, Burns said that she "dealt with [her burglaries] on [her] own" and did not report them because "it would be a waste of time." She said, "I took care of it myself. * * * I called some people that I knew and told them what was taken and I got it back."
 {¶ 19} In light of Burns's comments, we hold the trial court did not err in accepting the prosecutor's race-neutral explanation for the challenge. Accordingly, we overrule the first assignment of error.
 {¶ 20} In his second assignment of error, Stonestreet challenges the weight and sufficiency of the evidence to support his convictions for one count of aggravated robbery, robbery, and two counts of felonious assault.
 {¶ 21} When reviewing the sufficiency of the evidence to support a criminal conviction, we must examine the evidence admitted at trial in the light most favorable to the state and determine whether such evidence could have convinced any rational trier of fact that the essential elements of the crime had been proved beyond a reasonable doubt.[7]
 {¶ 22} A review of the manifest weight of the evidence puts the appellate court in the role of a "thirteenth juror."[8] We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[9] A new trial should be granted only in exceptional cases where the evidence weighs heavily against conviction.[10]
 {¶ 23} The state proceeded against Stonestreet as either a principal or an accomplice. As an accomplice, Stonestreet "could be held criminally liable as if [he] was the principal offender and was criminally culpable to the same degree as the principal offender."[11] To pursue a conviction under a complicity theory of aiding and abetting, the state "must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal."[12]
 {¶ 24} The state presented sufficient evidence of all the elements of aggravated robbery, robbery and felonious assault. Faal was accosted, shot, and robbed of money. He suffered life-threatening injuries.
 {¶ 25} While Faal was not able to identify Stonestreet as one of his assailants until trial, he consistently professed that he was accosted by a group of men who threatened him with a gun, knocked him down, stole money from his pockets, and shot him. When Faal identified Stonestreet at trial, he claimed he was "100 percent" sure Stonestreet went through his pockets. Further, Stonestreet was a passenger in a Honda seen fleeing from the scene of the crimes immediately after the shooting. The police stopped the Honda several minutes later and apprehended the occupants, including Stonestreet. The police found $340 in the Honda and two firearms, one of which was forensically linked to a spent casing found at the scene of the shooting. Faal identified another occupant in the vehicle, Terry, as the assailant who first threatened him with a gun. Finally, the police found thousands of dollars and a flattened roll of duct tape, described as part of a "homemade robbery kit," in Stonestreet's pockets.
 {¶ 26} In light of this evidence, we hold that the state presented more than sufficient evidence to convict Stonestreet for his role as an accomplice in the aggravated robbery,[13] robbery,[14] and felonious assault[15] of Faal. The evidence showed that Stonestreet was not just a passenger in the vehicle with Terry and Roberts, but that he had actively aided and abetted in carrying out the crimes and shared the same criminal intent as the principals.
 {¶ 27} Finally, after weighing the evidence and considering the credibility of the witnesses, we cannot say that the jury lost its way and created a manifest miscarriage of justice. Faal's testimony was not always credible, but the jury was free to believe only portions of this testimony. We find these portions corroborated by other evidence and, therefore, decline Stonestreet's invitation to disturb the jury's verdicts.
 {¶ 28} Accordingly, the assignment of error is overruled.
 {¶ 29} In his final assignment of error, Stonestreet challenges his sentence. Stonestreet was convicted on one count of aggravated robbery, one count of robbery and two counts of felonious assault. The trial court imposed a seven-year term of incarceration on each count, to be served concurrently. Stonestreet did not receive the maximum term on any of the counts. Aggravated robbery is a first-degree felony carrying a prison term of three to ten years. Robbery and felonious assault are both second-degree felonies carrying a prison term of two to eight years.
 {¶ 30} Stonestreet argues that since he had never served a prison term, the trial court was required to impose the shortest prison term for each count. We disagree.
 {¶ 31} R.C. 2929.14(B)(2) provides that where an offender has not previously served a prison term, the court shall impose the shortest prison term authorized unless the court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender. This court has held that an offender's Sixth Amendment right to a jury trial is violated where the court bases the imposition of more than the minimum term upon facts not admitted by the defendant or proved to a jury beyond a reasonable doubt, such as a finding that the shortest prison term will demean the seriousness of the offense.[16]
But a trial court may consider, consistent with the Sixth Amendment, a defendant's prior convictions to enhance a sentence without resubmiting the facts of those convictions to a jury.[17] Accordingly, we have upheld the trial court's decision to impose more than the minimum prison term on an offender who had never been to prison where the decision was expressly based upon the offender's criminal history.[18]
 {¶ 32} Our review of the record indicates that the court made the relevant and necessary finding to impose more than the minimum term and that this finding is supported by the record. Prior to imposing more than the minimum term, the court found that the shortest prison term would not adequately protect the public from future crime by Stonestreet due to his prior criminal record. We note that Stonestreet's adult record from 1998 to 2004 included repeat misdemeanor drug convictions as well as misdemeanor convictions for obstructing official business, resisting arrest, possessing an open flask, driving without a license, and driving under suspension. In light of these persistent violations, we cannot clearly and convincingly find that the record does not support the court's finding or that the finding is contrary to law. Consequently, we cannot conclude that the trial court erred in imposing more than the minimum term, even though Stonestreet had not previously served a prison term.
 {¶ 33} The court found an alternative basis for the sentence: that imposing only the minimum term would demean the seriousness of the crime in light of Faal's injuries. This finding by the court violated Stonestreet's Sixth Amendment rights, but the error was harmless in light of the court's articulation of a separate, legitimate basis to support the imposition of more than the minimum term.[19]
 {¶ 34} Finally, Stonestreet argues that the aggravated robbery and robbery convictions involved allied offenses of similar import and that the trial court erred in not merging these convictions. We reject this argument on the basis of State v. Palmer,[20] in which this court held that the two crimes are not allied offenses of similar import.
 {¶ 35} Accordingly, we overrule the assignment of error.
 {¶ 36} Finding no merit to the assigned errors, we affirm the judgment of the trial court.
Judgment affirmed.
Painter, P.J., Sundermann and Hendon, JJ.
[1] (1986), 476 U.S. 79, 106 S.Ct. 1712.
[2] State v. Hill, 73 Ohio St.3d 433, 444-445, 1995-Ohio-287,653 N.E.2d 271.
[3] State v. Herring, 94 Ohio St.3d 246, 255-256, 2002-Ohio-796,762 N.E.2d 940.
[4] Id. at 256.
[5] State v. White, 85 Ohio St.3d 433, 1999-Ohio-281, 709 N.E.2d 140.
[6] Hill at 445.
[7] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[8] State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[9] Id., citing State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[10] Id.
[11] State v. Terrell, 1st Dist. No. C-020194, 2003-Ohio-3044, at ¶ 10.
[12] State v. Johnson, 93 Ohio St.3d 240, 2001-Ohio-1336, 754 N.E.2d 796, syllabus.
[13] R.C. 2911.01(A)(1).
[14] R.C. 2911.02(A)(2).
[15] See R.C. 2903.11(A)(1) (knowingly cause serious physical harm) and 2903.11(A)(2) (knowingly cause or attempt to cause serious physical harm to another by means of a deadly weapon).
[16] See State v. Montgomery, 159 Ohio App.3d 752, 2005-Ohio-1018,825 N.E.2d 250, at ¶ 12.
[17] See State v. Lowery, 160 Ohio App.3d 138, 2005-Ohio-1181,826 N.E.2d 340, at ¶ 43.
[18] See State v. McIntosh, 160 Ohio App.3d 544, 2005-Ohio-1760,828 N.E.2d 138, at ¶ 11.
[19] Lowery at ¶ 46.
[20] 148 Ohio App.3d 246, 2002-Ohio-3536, 772 N.E.2d 726.