DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant, Daryl Mickles, appeals his conviction for murder in the Lucas County Court of Common Pleas. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} On June 16, 2003, appellant was indicted on one count of murder, in violation of R.C. 2903.02(A), with a firearm specification. The matter proceeded to jury trial, and on May 26, 2005, the jury returned a verdict of guilty.
 {¶ 3} The facts presented at trial were as follows. On June 7, 2003, shortly after 9:00 a.m., Toledo police officers were dispatched to the area of 919 Forest Street, Toledo, Lucas County, Ohio to check on an individual slumped behind the wheel of a car. When they arrived, they found 39-year old Crystal Hunt, dead and bloodied in the driver's seat of her car. The car was parked on the street outside Hunt's home, and the driver's side window of the car was shattered. On the floor of the car, in front of the front passenger seat, was a 9 millimeter shell casing. From this initial investigation, it appeared that Crystal had been fatally shot by a single bullet that had entered the left side of her neck and exited through her chin.
 {¶ 4} Further investigation revealed that on the day of June 6, 2003, Crystal had been hosting a high school graduation party for her nephew. Several family members were present for the party, including her daughter, Davonna Hunt, her sister, Karen Hunt, and her niece, Paula Knowles. Appellant, with whom Crystal had had an off-and-on relationship, had also been present at the party that day. He and Crystal had recently started seeing each other again, and had planned to go to a hotel together after the party.
 {¶ 5} Testimony from various witnesses, including Davonna Hunt and neighbors Leon Gooden and David Thomas, revealed that appellant and Crystal had argued a great deal on the day of the party. Karen Hunt described appellant as having looked agitated that day, and that "you could feel the agitation in the atmosphere." The apparent discordance notwithstanding, appellant was observed loading his personal clothing into Crystal's car, and that night, sometime after 11:00 p.m., the two were seen leaving Crystal's home together.
 {¶ 6} Soon after Crystal and appellant left the home, neighbor Gooden knocked on the door and told Paula Knowles that the glass was broken out of Crystal's car window. Knowles did nothing in response to this information, but when she left Crystal's home at 1:15 a.m., on June 7, 2003, she did notice the broken glass.
 {¶ 7} Witness Carol Smith testified that she had known appellant for about nine months prior to the shooting, and that she and appellant had had an ongoing casual sexual relationship. On June 6, 2003, at approximately 11:00 p.m., Smith received a phone call from appellant, who told her that he was taking Crystal to a motel for the weekend. Shortly after she went to bed that night, appellant knocked on her door. He went into Smith's bedroom and lay across the bed crying and saying he was sorry. When appellant refused to tell Smith what had happened, Smith and appellant began to argue. At that point, Smith got up and turned on the lights in the bedroom. She noticed blood on her sheets and began questioning appellant about where it came from. Appellant pulled up his pants leg and told her that he had been in a fight in the alley. Smith noticed that appellant did not have any injuries to account for the blood. When appellant stood up from the bed, Smith observed what appeared to be blood on his pants. She took the sheet off the bed and threw it on the floor, as she and appellant continued to argue.
 {¶ 8} According to Smith, within 15 to 20 minutes of appellant's arrival at her home appellant began making telephone calls. He made these phone calls, to his mother and to an individual named Scotty, over a period of two hours, while he and Smith still continued to argue. Smith tried to get appellant to leave her home, but he refused and insisted upon staying the night. After sleeping on the floor, appellant arose at approximately 8:00 a.m., at which time he began making more phone calls. Smith heard appellant tell the person he called that he "messed up" and needed a ride. Appellant left at about 8:30 a.m., when his ride arrived. He took with him a blue hoody that he had previously balled up and left on the floor of Smith's bedroom.
 {¶ 9} Thereafter, Smith received a telephone call from a neighbor, who told her what had happened to Crystal, and that appellant was a suspect. Smith then decided to collect the bloody sheet and broken glass that she noticed on the floor of her bedroom. When police investigators arrived at her residence, she gave them the items she had collected and told them about appellant being at the house on the night in question.
 {¶ 10} Cassandra Agosti, the state's expert witness in DNA analysis testified that her examination of the sheet provided by Smith revealed that Crystal was a major contributor to a blood stain that was found on the sheet. According to Agosti, the chance that anyone else would match that particular profile on the sheet was one in 167 quadrillion 400 trillion.
 {¶ 11} Karen Kwek, the state's expert in trace analysis, testified that she conducted comparison testing on the glass submitted by Smith from her bedroom floor and the glass collected from Crystal's vehicle and found that they could share a common origin.
 {¶ 12} Detective Mike Riddle, the lead investigating officer from the Toledo Police Department, testified that he verified through telephone records that on the night of the shooting, two calls had been placed from Crystal's phone to Smith's phone: the first was made at 11:00 p.m., the second, at 11:22 p.m. Riddle also verified that a number of telephone calls were made in succession from Smith's residence in the early morning hours of June 7, 2003.
 {¶ 13} Detective Terry Cousino from the Toledo Police Scientific Investigation Unit responded to the scene of the shooting, photographed the scene, and collected evidence. The evidence included glass fragments from Crystal's car, a .9mm shell casing and a partial latent palm print located on the roof of the vehicle above the passenger door. Cousino testified that he did a palm print comparison of the latent print that was lifted from Crystal's vehicle with a known print from appellant, and found that the latent print lifted from the vehicle was appellant's right palm print. Cousino also testified that he had determined from the physical evidence present at the scene of the shooting that the shot that caused Crystal's death came from inside the vehicle and exited through her seatbelt strap and out the driver's door. In addition, Cousino testified that the front passenger seat of the vehicle was clean and void of blood spatter, indicating to him that someone may have been sitting in the passenger seat when the fatal shot was fired.
 {¶ 14} Finally, there was testimony by Cynthia Beisser, M.D., a forensic pathologist and the Deputy Lucas County Coroner, that Crystal died as a result of a single gunshot wound to the neck. Testimony by Davonna Hunt established that appellant had a nine millimeter handgun for about two weeks prior to date of the shooting, and testimony by Leon Gooden established that appellant had the gun on his person on the morning of the shooting.
 {¶ 15} On appeal, appellant raises the following assignments of error:
 {¶ 16} I. "THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN OVERRULING DEFENSE COUNSEL'S BATSON OBJECTION THEREBY VIOLATING THE DEFENDANT'S EQUAL PROTECTION RIGHTS GUARANTEED TO HIM BY THEFOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION."
 {¶ 17} II. "THE EVIDENCE PRODUCED AT TRIAL WAS INSUFFICIENT AS A MATTER OF LAW TO SUPPORT THE JURY'S VERDICT."
 {¶ 18} III. "THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 19} We begin with appellant's first assignment of error, wherein he argues that the trial court erred when it overruled defense counsel's objection to the state's peremptory challenge of a black prospective alternate juror. Specifically, appellant argues that the state peremptorily challenged the juror because of her race, in violation of Batson v. Kentucky (1986),476 U.S. 80.
 {¶ 20} In Batson, the Supreme Court of the United States held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." Id., at 89. To determine whether a prosecutor's use of a peremptory challenge is racially motivated, the court in Batson created the following three-part test:
 {¶ 21} "First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination."
 {¶ 22} We note that while the three steps outlined above comprise the analysis set forth in Batson, the United States Supreme Court subsequently held in Hernandez v. New York
(1991), 500 U.S. 352, 359, that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."
 {¶ 23} Although a denial of discriminatory motive or an affirmation of general good faith will not suffice, the prosecutor's explanation "need not rise to the level justifying exercise of a challenge for cause." Batson, supra, at 97. In fact, the prosecutor's explanation for striking a prospective juror is not required to be "persuasive, or even plausible. `At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" Purkett v. Elem (1995), 514 U.S. 765,768, quoting Hernandez, 500 U.S. at 360.
 {¶ 24} In the final step of the analysis, the trial court must decide whether the opponent of the strike has carried his burden of proving purposeful discrimination. Purkett,514 U.S., at 767. "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies `peculiarly within a trial judge's province.'"Hernandez, 500 U.S. at 365, citing Wainwright v. Witt,469 U.S. 412, 428.
 {¶ 25} It is at this stage that "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination. But to say that a trial judge maychoose to disbelieve a silly or superstitious reason at step three is quite different from saying that a trial judge mustterminate the inquiry at step two when the race-neutral reason is silly or superstitious. The latter violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."Purkett, supra, at 768 (emphasis added).
 {¶ 26} A trial court's determination of a Batson issue will not be reversed on appeal absent a finding that the trial court's decision was clearly erroneous. State v. Hernandez (1992),63 Ohio St.3d 577, 583, certiorari denied, 506 U.S. 898, citingHernandez, 500 U.S. 532, supra. "To overturn the trial court's finding that there was no discriminatory intent, this court must be left with the definite and firm conviction that a mistake was committed." State v. Belcher (1993), 89 Ohio App.3d 24, 30.
 {¶ 27} In the instant case, the trial court participated in the following exchange with the prosecutor (Christopher Anderson), and defense counsel (Ron Wingate), as it considered the Batson challenge:
 {¶ 28} "MR. ANDERSON: Your Honor, initially I note for the record that there's one, two, three, African jurors sitting on the actual panel. I would state for the reason we are exercising the peremptory is she was unemployed at this point in time, seeking employment. We really want jurors that have more of a connection to the community at least made. That's the rationale we're having, race neutral.
 {¶ 29} "THE COURT: There are other jurors, in my recollection, serving that are likewise unemployed.
 {¶ 30} "MR. ANDERSON: Yes.
 {¶ 31} "THE COURT: And so I think that reason in of itself could be insufficient.
 {¶ 32} "MR. ANDERSON: It is a race neutral reason. The rationale at this point, I know there's one other juror that's on the panel that is African-American that's unemployed that we did not choose to exercise a peremptory. It's basically a question just to have to offer some reason. I don't believe he's shown we are using a pattern to discriminate this person by eliminating or using a system, mathematic method, to eliminate African-American from this panel, a good quarter are African persons which is above the percentage of the problem.
 {¶ 33} "THE COURT: I know of no cases I've read of after you get to a particular percentage that would insulate the necessity of a basis. And yes, sir, Mr. Wingate.
 {¶ 34} "MR. WINGATE: Your Honor, I'll just indicate that the Court correctly eluded to, there were other jurors on the panel that are still on the panel that have indicated they were unemployed. The State seems to make reference to the fact that there were three other African-Americans who are actually seated on the panel, and again, I am unaware of any situation which limits the number of African-Americans, limits the number of African-Americans participating in a particular jury pool which would insulate the State from being held to the burden of providing a race neutral reason as to why they would exclude a person of color. I believe on the basis that the State has given simply she is unemployed that is insufficient.
 {¶ 35} "THE COURT: Yes, sir.
 {¶ 36} "MR. ANDERSON: I would disagree. We're in a situation where Batson precludes a systematic preclusion of a racial minority on this jury. Peremptories are within our judgment, thinking there are certain things we are considering, and that we just, just have to give a race neutral reason because we didn't eliminate the other one, it's so insignificant here, there's no systematic elimination of these jurors.
 {¶ 37} "THE COURT: I simply question not the basis of whether an individual is unemployed, whether that same basis should not in fact apply to —
 {¶ 38} "MR. ANDERSON: No. I don't think we have to do that because I would prefer to have one of the alternates sit there instead of this juror. It has nothing to do with the race of the juror.
 {¶ 39} "MR. WINGATE: I will indicate according to my records Mr. Adams is the individual that's not employed and he is not a person of color, whereas, Mrs. Rogers is and had indicated she was unemployed and the State utilizing it's peremptory to exclude Mrs. Rogers —
 {¶ 40} "MR. ANDERSON: No, incorrect, Your Honor. Mr. Adams we agreed he's unemployed because he's retired. The other unemployment was Ashley Gray who is of color.
 {¶ 41} "THE COURT: Okay. The Court will overrule the objection. Edna Rogers will become — well no, panel is with the defendant.
 {¶ 42} "MR. WINGATE: The Court's granting the State's peremptory?
 {¶ 43} "THE COURT: Yes. I'm allowing it. I'm overruling your objection."
 {¶ 44} Here, because the prosecutor offered what was undisputedly a race-neutral explanation for the peremptory challenge (i.e., that the prospective juror was unemployed), and the trial court ruled on the ultimate question of intentional discrimination, the first part of the analysis (dealing with the issue of whether appellant made a prima facie showing) is moot, see, Hernandez, 500 U.S., at 359, and the second part of the analysis (dealing with the prosecutor's burden to articulate a race-neutral explanation) has clearly been satisfied.
 {¶ 45} This leaves for our consideration only the third part of the analysis, dealing with whether the trial court clearly erred in overruling defense counsel's objection to the state's exercise of the peremptory challenge. Although the trial court did eventually find in favor of the state on this issue, its immediate reaction was to express uncertainty about the sufficiency of the state's explanation. Apparently dubious about the state's credibility, the court pointed to the fact that there were already two unemployed jurors on the panel whom the state had not previously challenged. The state declined to offer any reason for the disparate treatment of the various potential jurors, but did offer its assurance that its exercise of the peremptory had nothing to do with race. The trial court, after hearing this assurance by the state, and after considering that one of the two unemployed jurors was a person of color, and that three of the 12 jurors already on the panel were African-American, was ultimately persuaded that defense counsel had failed to demonstrate purposeful discrimination. Based on our review of the record, and giving due deference to the trial court's findings, we cannot say that the trial court clearly erred in overruling appellant's Batson challenge. Accordingly, appellant's first assignment of error is not well-taken.
 {¶ 46} As appellant's second and third assignments of error both involve the weight and sufficiency of the evidence in this case, we will consider them together. A criminal conviction may be overturned on appeal either because it is against the manifest weight of the evidence or because there is an insufficiency of evidence. When determining whether a conviction is against the manifest weight of the evidence, the appeals court acts as a "thirteenth juror" to determine whether the fact-finder lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered. State v.Thompkins (1997), 78 Ohio St.3d 380, 387. In making this determination, we must review the entire record, weigh the evidence and all reasonable inferences, and consider witness credibility. Id. Because the fact-finder sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. State v. Lawson (Aug. 22, 1997), 2d Dist. No. 16288.
 {¶ 47} When making a determination as to sufficiency of the evidence, the court must consider whether the evidence submitted is legally sufficient to support each of the elements of the charged offense. Thompkins, 78 Ohio St.3d at 386-387. Specifically, we must determine whether the state has presented evidence which, if believed, would satisfy the average person of the defendant's guilt beyond a reasonable doubt. See id. at 390;State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 48} R.C. 2903.02(A) relevantly provides that "[n]o person shall purposely cause the death of another." In the opinion of this court the evidence in this case abundantly supports each of the elements of the offense charged and would certainly convince the average person of appellant's guilt beyond a reasonable doubt. Further, after reviewing the entire record and weighing all the evidence and reasonable inferences, and considering witness credibility, it is clear that the fact-finder did not lose its way and there was not such a miscarriage of justice that the conviction must be reversed and a new trial ordered.
 {¶ 49} Arguing against this conclusion, appellant points out that no one witness could put appellant with the victim at the time of the murder or saw him commit the murder. But the mere fact that the prosecution relied on circumstantial evidence, as opposed to direct evidence, to establish its case is of no consequence herein. This is because "circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof."State v. Jenks, 61 Ohio St.3d 259, at paragraph one of the syllabus.
 {¶ 50} Appellant further points out that that no witness could suggest a reason for appellant to purposely cause the death of Crystal Hunt. The law is clear, however, that although the question of motive is generally relevant in all criminal trials, the prosecution need not prove motive in order to get a conviction. State v. Curry (1975), 43 Ohio St.2d 66, 70-71.
 {¶ 51} Finally, appellant points to the fact that no murder weapon was recovered and that no clothing belonging to appellant was ever presented. In raising this issue, appellant misses the point of the test of sufficiency, which "is concerned not with what evidence the state failed to produce, but with that which it did." State v. Paramore (Sept. 19, 1997), 1st Dist. No. C-960799. As indicated above, the evidence in this case was clearly sufficient to support appellant's conviction. Additional evidence in the form of a murder weapon or clothing was simply not necessary. Cf. State v. Lowery, 160 Ohio App.3d 138,2005-Ohio-1181, at ¶ 26 (finding that evidence of murder weapon and other physical evidence were not necessary to convict him.)
 {¶ 52} For all of the foregoing reasons, appellant's second and third assignments of error are found not well-taken. The judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, J., Pietrykowski, J., Skow, J., concur.